# GEORGE BOLLN COMPANY v. NORTH PLATTE VALLEY IRRIGATION COMPANY.

## (No. 678.)

STATUTES—SIGNING OF BILLS—LEGISLATIVE JOURNALS—SUFFICIENCY
OF ENTRY—CONFLICT—CONSTITUTIONAL LAW—DUE PROCESS OF LAW
—LIBERTY OF CONTRACT—EQUAL PROTECTION OF THE LAWS—
DITCHES—CONSTRUCTION—CONTRACTOR'S BOND—VALIDITY OF STAT-
UTE CREATING LIABILITY OF OWNER UPON FAILURE TO TAKE BOND.

1. Section 28 of Article 3 of the Constitution, which provides
that the presiding officer of each house shall, in the pres-
ence of the house over which he presides, sign all bills
and joint resolutions passed by the Legislature immediately
after their titles have been publicly read, and that the fact
of signing shall be at once entered upon the journal, is
mandatory.

2. If there is a conflict between an enrolled act and the journal
as to the fact of the signing of a bill by the presiding
officer, the journal, being the best evidence, should control.

3. At the top of the first page of the enrolled act on file in
the office of the Secretary of State, which was published
as Chapter 78, Laws of 1909, appears the notation "Origi-
nal House Bill No. 69. Enrolled Act No. 73"; and it
bears the same title as that of House Bill No. 69, which
was shown by the journals of the House and Senate to
have passed both houses, and by the House Journal to
have been properly enrolled as Enrolled Act No. 73. In
the only entry in the Senate Journal of the signing of said
published act by the President of the Senate it was de-
scribed as "House Enrolled Act No. 73, original being
House Bill No. 96," followed by the title of House Bill
No. 96 as it was introduced. It appeared by the House
Journal that said House Bill No. 96 passed the House,
but was indefinitely postponed in the Senate. *Held,* that
the recital in said entry in the Senate Journal that the
act signed was House Enrolled Act No. 73, was to be taken
as speaking the truth, for it was supported in that respect
by all other recitals in the journal with reference to the
bill, and that the recital that the original of said Enrolled
Act was House Bill 96, must be rejected as erroneous;
and so construing the entry, the fact of signing was entered
upon the journal as required by Section 28 of Art. 3 of
the Constitution.

4. Where there is a conflict in the recitals of a legislative journal with reference to a bill, it is proper to look beyond the entries in dispute for evidence as to which entry is the correct one, in order to determine whether a published act was passed and signed as required by the Constitution.

5. The first section of Chapter 78, Laws 1909, requires a ditch owner to take from the person with whom a contract is made for the construction of the ditch a good and sufficient bond in some guarantee or surety company authorized to do business in this state, conditioned that such contractor shall pay or cause to be paid all laborers, mechanics, ranchmen, farmers, material men, merchants and other persons who supply him or any of his sub-contractors with labor, work, materials, ranch or farm products, provisions or goods of any kind, all just debts incurred therefor in carrying on such work, such bond to be filed with the county clerk, and provides that if the owner fails to take such bond he shall be liable to the persons mentioned to the full extent of all such debts so contracted by such contractor, or any of his sub-contractors. *Held,* that in so far as the statute requires a surety or guaranty company bond, and creates a personal liability for other things than labor and materials which actually go into the work and thereby enhance the value of the property, it is unconstitutional and void, as an interference with liberty to contract, a taking of property without due process of law and a denial of the equal protection of the laws.

[Decided February 13, 1912.]                    (121 Pac. 22.)

Reserved Questions from District Court, Converse County; Hon. Charles E. Carpenter, Judge.

The reserved questions are stated in the opinion.

*F. H. Harvey,* for plaintiff.

The general propositions involved in the question as to the legislative procedure in the passage of the act referred to in the reserved questions were fully considered by this court in Hynds v. Cahill, 12 Wyo. 225, and State v. Swan, 7 Wyo. 166, and that phase of the case is submitted on the part of the plaintiff without argument. The novelty of the statute does not necessarily militate against its validity. It is a matter of legislative policy to determine to whom

the protection of such laws shall extend. The abstract question whether the grocer who supplies the food for the men who do the work in excavating a ditch or canal contributes to the value of the completed work in a measure and manner sufficiently direct to justify his protection by the law has been determined in the affirmative by the legislature; and if the law is not violative of some constitutional provision, it should be sustained. The original purpose of mechanics' lien laws has long since been lost sight of, and, by an imperceptible process of extension, they have been brought to include everything that may be necessary to secure to either mechanics, material-men or contractors, pay for any service rendered in the betterment of the property. "Whatever may be said of the wisdom of this sort of class legislation, its validity and constitutionality is too well settled to admit of dispute." (Church v. Smithea, (Colo.) 35 Pac. 267.) The reasoning in the case of Gibbs v. Tally, 65 Pac. 970, relied upon by counsel for the defendant, is not satisfactory, but it is submitted that the better reasoning is to be found in the line of decisions represented by Laird v. Moonan, 32 Minn. 358, and Henry &c. Co. v. Evans, (Mo.) 10 S. W. 868, which hold that statutes providing for liens in favor of sub-contractors and others are not unconstitutional, although the liens are not limited to the amount agreed to be paid to the owner by the contractor. (27 Cyc. 19.) As to the contention that the statute is class legislation, it may be said that though mechanics' lien laws have generally been assailed on that ground, the validity of the laws has been sustained. (State v. Loomis. 115 Mo.) The determination of what constitutes a reasonable basis for separate laws with reference to given matter is a matter resting primarily with the legislature. This state had entered an era of extensive ditch and railroad construction. It was desirable to encourage and facilitate this work, and on the other hand quite as desirable that the local producers and dealers, who might furnish the necessary material, produce and supplies, should have some effective security. Ordinary lien laws had proved ineffec-

tive to protect them. It is a fact demonstrated by actual experience that ranchmen and merchants have found that ditch and railroad owners, in the matter of construction of ditches and railroads, constitute a distinct class which cannot be effectively dealt with under ordinary business methods. The act under consideration seems to reasonably solve the difficulty, and it imposes no serious burden upon the owner, while furnishing effective security to the producer and dealer. The conditions which thus exist evidently brought about the enactment of this statute.

*Clark & Clark,* for defendant.

The legislative journal shows a full compliance with the constitutional provisions relating to the passage of the bill, with the exception of the signing of the enrolled act by the president of the senate. This court has laid down certain rules with reference to the necessity for a showing by the journal of the signing of the enrolled act at the time and in the manner required by the constitution. (Hynds v. Cahill, 12 Wyo. 225; State v. Swan, 7 Wyo. 166.) Assuming the law to be that the journals must affirmatively show the signing of the bill by the presiding officers in the presence of the respective houses, the question arises whether such an affirmative showing is made in this instance. Had the entry in the senate journal been that the president of the senate signed "Enrolled Act No. 73," it must be conceded that it would be sufficient, it appearing that the original enrolled act was No. 73. But the entry goes further than that and states the number of the original house bill as well as the title of the bill bearing that number. While it is easy to make a mistake by the inversion of numbers, it is not usual to make mistakes in the reading or entry of the entire title of a bill. The court is not authorized to enter the realm of conjecture to uphold this act upon the supposition that one mistake was made instead of another, or that the entry did not speak the truth. Legislative journals are not kept as a matter of convenience, but are required by the constitution, and by that constitu-

tion are made conclusive evidence, so that their verity cannot be impugned.   (Cohn v. Kingsley, 5 Ida. 416; Hunt v. State, 22 Tex. App. 401; R. R. Co. v. Smyth, 103 Fed. 376; State v. R. R. Co., 60 Neb. 741; Fillmore v. Van Horn, 129 Mich. 52.)   The mere fact that the senate journal shows the signature of the president to enrolled act No. 73, together with the evidence of the house journal that said enrolled act was the bill here in question, is not sufficient to satisfy the constitutional requirement that the fact of signing in the presence of the senate be entered in the journal; for the senate journal affirmatively shows that the enrolled act then before the president, the title of which was publicly read, as required by the constitution, was a bill with another title, and dealing with another subject.   It cannot be demonstrated that this was a mere clerical error, and such a showing, if it can be made, would be immaterial, for the journals imply absolute verity, and when they set out the title of a bill it must be conclusively presumed that the bill had such title at the time in question.

The constitutionaliy of original mechanics' lien laws has been esablished beyond question.   (Jones v. Hotel Co., 86 Fed. 370, 193 U. S. 532.)   The basis for such laws is the equitable right to compensation of those whose labor or materials have gone into the improving of another's property.   The statute in question ignores that basis upon which such laws have been sustained.   The furnishing of such articles as food, clothing and fuel to workmen engaged by the contractor in constructing a ditch cannot be said to be materials entering into the construction of the improvement.   Such a statute as this, which can only be sustained upon the same ground that a mechanics' lien law is sustained, making the owner liable for provisions and clothing, &c., furnished to the contractor for his employees, must be considered an invalid deprivation of property without due process of law.   The statute does more than create a lien upon property, for it creates an obligation upon the owner for materials which he did not order and which were not furnished upon his credit.   Assuming that the

owner's property has been improved by the labor or materials furnished, the statute endeavors to make him liable for the entire value of the material furnished, even though far in excess of the value of the property improved. There is no equitable or moral reason why a ditch company should be responsible for such material or provisions furnished to the contractor employed by the ditch company to construct its ditch. The section of the statute, so far as it imposes a personal liability upon the owner, is clearly unconstitutional. (Gibbs v. Tally, 133 Cal. 133, 65 Pac. 970.) Another fatal objection to the statute is that it is class legislation, and therefore violates the provision of the federal constitution prohibiting the states from denying to any person the equal protection of the laws. (R. R. Co. v. Ellis, 165 U. S. 150; Shaugnessy v. Surety Co., 138 Cal. 543.)

BEARD, CHIEF JUSTICE.

This case comes to this court on questions reserved by the district court of Converse county and certified here for decision as to the constitutionality of Chapter 78 of the Session Laws, 1909, entitled: "An act to protect laborers, mechanics, ranchmen, farmers, merchants and other persons furnishing work or labor, material, ranch or farm products, goods or provisions, to contractors or sub-contractors in the construction of ditches, canals and reservoirs;" and now being Sections 3823, 3824 and 3825, Comp. Stat. 1910. The reserved questions being as follows:

"1.   In the passage of Chapter 78 of the Sssion Laws of Wyoming, 1909, did the legislature violate the provisions of Section 28 of Article III of the Constitution of the State of Wyoming?"

"2.   Does the journal of the senate of the Tenth State Legislature of the state of Wyoming sufficiently show the signing by the president of the senate in the presence of the senate of Chapter 78 of the Session Laws of Wyoming, 1909?"

"3. Does the first sentence of Section 1 of Chapter 78 of the Session Laws of Wyoming, 1909, violate the provisions of Section 6 of Article I of the Constitution of the State of Wyoming?"

"4. Does the first sentence of Section 1 of Chapter 78 of the Session Laws of Wyoming, 1909, violate the provisions of Section 1 of the fourteenth amendment to the Constitution of the United States?"

Section 28, Article III of the Constitution, referred to in the first question, is as follows: "The presiding officer of each house shall, in the presence of the house over which he presides, sign all bills and joint resolutions passed by the legislature immediately after their titles have been publicly read, and the fact of signing shall be at once entered upon the journal." On this branch of the case two questions are presented. First—Is this provision of the constitution mandatory? And second—If so, does the senate journal show a compliance with such provision? The first question is very ably and elaborately discussed in State ex rel. Hynds v. Cahill, 12 Wyo. 225; and while the question was there left undecided because not necessary to a determination of the case, we think one reading that discussion can arrive at no other conclusion than that the court as then constituted would have held the provision mandatory had it been necessary to decide the point. The court as now constituted deems it sufficient, without encumbering the reports by repeating what was there said, to concur in and adopt as the basis of its decision, the reasoning in that case, and to now hold the provisions of said Section 28, Article III of the Constitution to be mandatory.

Second—Does the senate journal show a compliance with that provision of the constitution? It is contended by counsel for defendant that it does not; but, to the contrary, shows affirmatively that at the time the bill was signed by the president of the senate it bore a different title than that of Chapter 78, Session Laws, 1909, and relating to an entirely different subject.

The only entry found in the senate journal with reference to the signing by the president of the senate of the act in question is found on page 521, Senate Journal 1909, under the heading, "Signing of Enrolled Acts," and is as follows: "Mr. President thereupon gave notice that he was about to sign, and he did, thereupon, in the presence of the senate, affix his official signature to the following enrolled acts, to-wit:" * * * "House Enrolled Act No. 73, original being: House Bill No. 96—A bill for an act relating to the issuance of certificates of appropriation under permit, and to the use of the waters of the State of Wyoming for power purposes." The journal entries under the heading and recital above set out, describe more than twenty bills as being then signed, two preceding and the others following the one set out above, and in each instance describes the bill in the same manner by giving the number of the enrolled act, the number of the original house bill and the title of the act. An examination of said Chapter 78, Session Laws 1909, on file in the office of the secretary of state, discloses that it bears at the top of the first page the following: "Original House Bill No. 69." "Enrolled Act No. 73," followed by the title and body of the act as published in the Session Laws 1909, as Chapter 78. The house journal shows that House Bill No. 96, bearing the title as recited in the senate journal, passed the house (H. J., p. 313), went to the senate and was there referred to a committee (S. J., p. 272), was reported back to the senate by the committee without recommendation (S. J., p. 317), and was indefinitely postponed by the adoption of the report of the committee of the whole of the senate so recommending. (S. J., pp. 330-1). House Bill No. 96, therefore, never passed the senate or became an enrolled act. The history of House Bill No. 69, briefly stated, is as follows: as introduced and as it passed the house it bore the title of Chapter 78, S. L., was amended in the senate, the house concurred in the senate amendment and passed the bill as amended, was reported by the house enrolling committee as properly enrolled as "Enrolled Act No. 73," and as such

signed by the speaker of the house. (H. J., pp. 154, 554, 557 and 579; and S. J., pp. 314, 439, 443 and 478.) House Bill No. 69, therefore, as shown by the journals, was regularly passed by both houses, was properly enrolled as "Enrolled Act No. 73," and duly signed by the speaker of the house; and the enrolled act on file in the office of the secretary of state bears the signature of the speaker of the house, the president of the senate and of the governor, approving the same. If there was simply a conflict between the enrolled act and the senate journal as to the signing of the bill, the latter being the best evidence should control. But here we find not only such a conflict, but a conflict in the journal recital itself. Either the recital that the bill then signed was "House Enrolled Act No. 73," or that it was "House Bill No. 96—a bill for an act," etc., is erroneous. We must therefore look beyond the single journal entry for evidence as to which of the two is correct. Tracing the history of the two bills—House Bill No. 69, and House Bill No. 96—as shown by the journals, we have little difficulty in arriving at the conclusion that it was "Enrolled Act No. 73," which was in fact House Bill No. 69. The senate journal recites that the president of the senate gave notice that he was about to sign and did then sign certain enrolled acts. Then follows the description of the bills then signed, and in each instance the number of the enrolled act is given as well as the other description; and had the journal, in this instance, contained the number of the enrolled act only, it would no doubt have been sufficient. Again, House Bill No. 96 never having passed the senate or become an enrolled act, could not properly have been among the bills then signed; while House Bill No. 69 had been regularly passed by both houses, and had been properly enrolled, bore the signature of the speaker of the house, and was in proper condition to be then signed by the president of the senate. How the error in the senate journal occurred we have no means of knowing; but it seems quite probable that on that last busy session of the senate, the clerk inadvertently transposed the figures 6 and 9, and in writing up

the journal in full from his minutes took the title from House Bill No. 96, instead of from Enrolled Act 73. But, however the error may have occurred, we think the recital in the journal, which is supported by the enrolled act and by all other recitals in the journal with reference to the bill, must be taken as speaking the truth and that the other description of the bill must be rejected as the erroneous one. Such being our opinion, the first reserved question is answered in the negative, and the second in the affirmative.

The third and fourth questions call for a determination of the validity of the first sentence of section one of the statute in question on other grounds. Counsel for defendant contend that it violates Section 6, Article I of the Constitution of this state, which provides, "No person shall be deprived of life, liberty or property without due process of law;" and also the provisions of the fourteenth amendment to the Constitution of the United States, that no state shall make or enforce any law denying to any person within its jurisdiction the equal protection of the laws. The part of the statute thus questioned is as follows: "Whenever any ditch or canal company, or other owner or owners, shall contract with any person, persons or corporation, for the construction of its, his or their ditch, canal or reservoir, or any part thereof, such company, owner or owners, shall take from the person, persons or corporation with whom such contract is made, a good and sufficient bond in some guarantee or surety company authorized to do business in this state, conditioned that such contractor or contractors shall pay or cause to be paid all laborers, mechanics, material men, ranchmen, farmers, merchants and other persons who supply such contractor or contractors, or any of his or their sub-contractors with labor, work, materials, ranch or farm products, provisions or goods of any kind, all just debts incurred therefor in carrying on such work, which bond shall be filed by such company or other owner in the office of the county clerk and ex officio register of deeds in the county where the principal work of such contractor shall be carried on; and if any such ditch or canal company or

other owner or owners shall fail to take such bond, such
ditch or canal company or other owner or owners shall be
liable to the persons herein mentioned to the full extent of
all such debts so contracted by such contractor, or contrac-
tors, or any of his or their sub-contractors." The other
provisions of the act relating to actions on the bond, etc., are
not involved in this case.

The effect of the statute, if it can be upheld, is to extend
the application of the principles upon which mechanics' lien
laws are founded and to render the owner personally liable
not only for the labor and materials which actually go into
the improvement and thereby enhance the value of the prop-
erty, but also for all just debts incurred by the contractor
or any of his sub-contractors for labor, work, material,
ranch or farm products, provisions or goods of any kind
in carrying on such work, unless he takes from the con-
tractor the bond provided for by the statute. That the
legislature cannot make the owner personally liable for
other things or to a greater amount than it can create a
lien upon his property we have no doubt; and if the statute
under consideration does so, to that extent it is invalid.
In many states the liens given for labor performed for,
or for materials furnished to the contractor or sub-contrac-
tor are limited by the statutes to the contract price between
the owner and the original contractor, or to a lesser amount,
or to the amount due or to become due to the contractor
at the time of giving notice, etc. In other states a lien is
given for labor and materials without regard to the contract
price or the state of the account between the owner and
the contractor. The latter class of statutes has been many
times attacked as unconstitutional on the grounds that are
here urged against the statute above quoted. In a majority
of the state courts, and in the federal courts, the consti-
tutionality of such statutes have been upheld to the extent
of the value of the labor or materials which have actually
gone into the building or other structure or improvement,
upon the principle that, equitably, those who have furnished
labor or materials which have gone into and thereby in-

creased the value of the property should be compensated therefor by the owner who has been benefited thereby. Many cases are cited and reviewed by Judge Lurton in the case of Jones et al. v. Great Southern Fireproof Hotel Co., 86 Fed. 370, which decision was affirmed by the Supreme Court of the United States, 193 U. S. 532. But our statute goes much further and imposes upon the owner an obligation to require the contractor to give security for debts that he or any of his sub-contractors may contract with third persons for supplies and goods of any kind in carrying on the work, and which do not enter into or become a part of the work, or enhance its value, and for which, but for the statute, the owner is in no wise liable. To illustrate. The first eight items of the account in suit are:

"March 3. 2 kerchiefs 20, Oshoes 1.75, W. Sox 1.00, Rowe 2.95.

"Mits 1.25, 2 shirts 1.00, Underwear 2.75, Rowe 5.00.

"Jumper 85, Blanket 1.25, Rowe 2.10."

The account containing many items of like kind, and also dry goods, pipes and tobacco, etc. Upon what principle of natural justice can one who lets a contract for the construction of a ditch, canal or reservoir be required to take security or to become personally liable for debts which may be contracted by the contractor or any of his sub-contractors for goods or supplies which do not enter into the work or add to its value and from which one derives no benefit? What justice is there in requiring a homesteader, desert entryman or other land owner who lets a contract for the construction of a ditch to conduct water onto his land to take security from such contractor that he (the contractor) will pay all debts contracted by him or any of his sub-contractors for groceries, clothing, bedding, etc., in carrying on the work? We confess we can see none. The statute goes beyond the principles upon which lien laws have been sustained, viz: that the property is enhanced in value to the extent of the value of the labor and materials actually going therein. In the Jones case, supra, 86 Fed., on page 388, it is said: "If, then, this statute does not unduly restrain the

owner's liberty of contract, considered as an incident to the right of owning, possessing and enjoying property, the law must be constitutionally unobjectionable. If, however, this legislation is the mere arbitrary exercise of the powers of government, unauthorized by the established principles of private right, and not having the sanction of natural justice, it is not the law of the land. But we have already seen that the underlying purpose of the act is not to arbitrarily and unnecessarily oppress the owner in any incident of his right as owner, but to secure those who, by their labor or materials, have contributed to the improvement of the owner's property. That the liens under consideration are given to secure debts which are primarily the debts of another would be fatal to the legislation, as taking the property of one to pay the debts of another, but for the equity arising from the use of the labor and materials by the owner." In the present case there is no allegation that a single item of the account sued on was for labor or materials that went into the work; but for goods, wares and merchandise to be used as supplies in the construction of a tunnel on the line of an irrigating canal, as set forth in an itemized account attached to the petition, the account consisting principally of provisions, clothing, bedding, hay and grain. The equities upon which the law giving a lien for labor and materials was upheld in the Jones case are entirely wanting in this case; and the statute, insofar as it requires the owner to take security or become personally liable for other debts of the contractor or sub-contractors than for those things —labor or materials—entering into the construction of the work and contributing to the improvement of the property and enhancing its value, in effect takes the property of the owner to pay the debts of another and is "fatal to the legislation."

A statute of Kansas provided, "That whenever any railroad company shall contract with any person for the construction of its road or any part thereof, such railroad company shall take from the person with whom such contract is made, a good and sufficient bond, conditioned that

such person shall pay all laborers, mechanics and material men, and persons who supply such contractor with provisions or goods of any kind, all just debts due to such persons, or to any person to whom any part of such work is given, in carrying on such work," etc.   This seems to have been taken as the model from which our statute was drawn, as it appears to be in almost identical language with a few additions and extending the liability to debts contracted by any sub-contractors; and as we learn by reference to the House Journal, pp. 251 and 2, the words "In some guarantee or surety company authorized to do business in this state," were not in the original bill but were inserted by amendment.   We are aware that the Kansas statute has been enforced by the courts of that state, but fail to find where its constitutionality has been raised, or passed upon by the courts of that state on the questions involved in this case.

In California a statute required a bond to be filed with the contract in at least twenty-five per cent. of the contract price to secure laborers and material men; and providing that a failure so to do made the owner personally liable. The statute had been enforced by the courts for some time without its constitutionality being questioned on the grounds that it deprived the party of his liberty of contract, or of his property without due process of law, or of equal protection of the laws.   But the statute was so attacked in the case of Gibbs v. Tally, 133 Cal. 373, 65 Pac. 970, and held unconstitutional as violative of Section 1, Article I, of the constitution of that state, and the fourteenth amendment to the Constitution of the United States. Statutes making a railroad company liable for labor and materials instead of giving a lien on the road therefor have been upheld upon the same principle and to the same extent as mechanics' lien laws, but no further, so far as we have been advised.

Another objection to this statute urged by counsel for defendant, while not a constitutional question, may be properly mentioned here.   That is, the amount or penalty of the

bond. The statute requires a good and sufficient bond conditioned for the payment of all just debts contracted by the contractor or any of his sub-contractors, for specified items, in carrying on the work, but fails to provide any method by which the amount of the liability can be determined at the time the bond is executed. It seems unreasonable to require a bond in an unlimited amount; and equally unreasonable to suppose that any surety or guarantee company would be willing to become surety on a bond so conditioned without the extent of its liability being therein fixed at a specific sum. Suppose the owner takes a bond in an amount reasonably believed to be sufficient at the time, but it should turn out to be entirely insufficient in amount. By the terms of the statute he would be personally liable at least for the excess. When a bond is required by a statute it should provide some method by which the obligor and his sureties —and in this instance the owner as well—can ascertain and fix a definite amount beyond which they could not be held. Whether a bond, if given, containing no penalty, would be valid and enforcible is quite a different question from requiring a bond containing certain conditions without prescribing the penalty for a breach of those conditions. Perhaps this defect might be cured by a provision for an official approval of the bond, in which case such approval might be held to attest the sufficiency of the penalty as well as of the sureties.

The only remaining question to be considered is, that the bond required by the statute must be "in some guarantee or surety company authorized to do business in this state." Prior to the adoption of this statute, and a similar one applying to railroad companies, passed at the same session of the legislature, all bonds required by law, so far as we have been able to discover, were permitted to be given with either personal or surety company security; and if personal security is sufficient for public officers, executors, administrators, etc., and in court proceedings, why not in this class of bonds? As said by the supreme court of Ohio in the case of State v. Robins, 71 O. St. 273-291, "It is very plain that the security companies may be greatly benefited

by this legislation, but an adequate corresponding benefit or protection to the general public, such as would justify such a radical and drastic limitation upon individual rights, is not apparent." The Ohio statute considered in that case requiring official bonds (with certain exceptions) and administrators' bonds above $2,000, to be surety company bonds, unless an affidavit was filed that application had been made to such company and refused, was held to be unconstitutional. The statute we are considering places it within the power of the half dozen surety companies authorized to do business in this state to prevent any ditch or canal company, or other owner, from letting a contract for the construction of any ditch, canal or reservoir, except under the penalty of becoming personally liable for the unlimited debts of others for things which have not gone into the work, and due to persons with whom the owner has no contractual relations. Or, if they become surety on such bond, they may charge what they please therefor. Such a requirement, in our opinion, is not only an unwarranted restriction upon the liberty to contract, but a denial of the equal protection of the laws: and insofar as the statute requires a surety or guarantee company bond, and creates a personal liability for other things than labor and materials which actually go into the work and thereby enhance the value of the property, it must be held to be unconstitutional and void. To that extent the third and fourth questions are answered in the affirmative.

Scott and Potter, JJ., concur.