# ARBUCKLE ET AL v. PFLAEGING.
## (No. 688.)

STATUTES—PASSAGE—CONSTITUTIONAL LAW—SIGNING OF BILL—LEG-
ISLATIVE JOURNALS—LEGISLATIVE POWER—DELEGATION—DUE PRO-
CESS OF LAW—ANIMALS—INSPECTION AND QUARANTINE LAWS.

1. Chapter 164 of the Session Laws of 1909, which was orig-
inally introduced as House Bill No. 137 and entitled, "A
Bill for an Act to amend and re-enact Section 150, and
repealing Sections 155, 156, 158 and 159 of the Revised
Statutes," relating to the duties of the state veterinarian
and providing that it should be his duty to superintend the
destruction of animals condemned because of disease, *held*
not to be invalid on the ground that the bill was so altered
or amended on its passage through either House as to
change its original purpose, since the amendment on the
passage of the bill by inserting in the title after the word
"Section" the words "148 and," and the addition of an-
other section in the bill giving the veterinarian power to
quarantine or require the treatment of diseased domestic
animals did not change the original purpose of the bill, but
Sections 150 and 148 of the Revised Statutes before and
after the amendment were not incongruous, but related to
the duties of the veterinarian as to stamping out or pre-
venting the spread of infectious diseases among cattle, and
both sections of the amendatory act were in furtherance of
that purpose, germane to, and within the scope of the sub-
ject of the bill.

2. A journal entry is evidence to be considered in determining
the question whether a bill has become a law by a vote of
a majority of all the members elected to each House taken
by ayes and noes, and the names of those voting were
properly entered on the journal as required by Section 25
of Article 3 of the Constitution, or whether the bill was
signed by the presiding officer of each House in the pres-
ence of the House over which he presided, after its title
was publicly read, and the fact of signing was properly en-
tered upon the journal, as required by Section 28 of said
article, but the court is not limited by the recital of a single
journal entry when, upon construing all the entries to-
gether, it is manifest that such single entry is erroneous or
incomplete, and, notwithstanding that fact, upon all the
entries the Constitution appears to have been complied

with; and the condition of the bill at the time of the vote upon its final passage was taken should also be considered.

3.  Chapter 164 of the Session Laws of 1909 having been originally introduced as H. B. No. 137, and purported by its title to amend and re-enact Section 150 of the Revised Statutes and repeal Sections 155 to 159, was amended so as to amend and re-enact Section 148 as well as Section 150. The bill was then engrossed and reported by the engrossing committee as H. B. No. 137, and the House journal showed that the bill bearing that number, for an act to amend and re-enact Section 150, was passed by a certain vote, and that the bill, having received the affirmative vote of a majority of all the members elected to the House, was declared to have passed the House. Other entries showed that the bill, as amended, was sent to the Senate, and, after being passed there, was signed by the Speaker as Enrolled Act No. 96. *Held,* that, although the entry showing the passage of H. B. No. 137 was insufficient standing alone, to show the passage of the bill *as amended,* the other entries were sufficient to show a compliance with the constitutional provision that a bill to become a law shall receive the vote of a majority of all the members elected to each house taken by ayes and noes, and that the names of those voting be entered on the journal.

4.  The presumption obtains, when the presiding officer of the House or the Senate, in the presence of the members, publicly affixes his official signature to a bill which has regularly passed the House over which he presides, that the title of the bill as it appears in the enrolled act, if publicly read at all as a condition precedent to such signing, was read in its entirety; and where the journal entry showing the signing by the Speaker of the House shows that the title was at least partially read, it is to be assumed that the Speaker performed his duty by signing the bill immediately after the complete title was publicly read, there being nothing in the journal entry of the signing that indicates an omission in the reading of any descriptive matter, and the Constitution not requiring the fact that the title was publicly read to be entered in the journal, but only that the fact of signing the bill be so entered immediately after the title shall have been publicly read.

5.  Where an entry in the House journal recited that the Speaker announced that he was about to sign Enrolled Act No. 96, which was an act to amend and re-enact Section 150, and

repealing Sections 155 to 159 of the Revised Statutes, and other recitals showed that the Speaker did then and there affix his official signature to such enrolled act; *Held* that, although the entry did not show a complete reading of the title, yet it would be presumed that the Speaker had done his official duty and had not signed the act in the absence of such reading, and hence the entry was sufficient to show a compliance with the constitutional requirement that the fact of signing be at once entered upon the journal after the title has been publicly read, it appearing from other entries that the bill enrolled as Enrolled Act No. 96 had duly and regularly passed both the House and the Senate.

6. Animal inspection laws may be enacted by the Legislature and enforced by the state through the officer or agent duly appointed or selected for that purpose, such laws being enacted and enforced in pursuance of the police powers of the state. The power cannot be used by the officer or agent arbitrarily or oppressively, but only in such cases and in the manner prescribed by the statute.

7 Chapter 164 of the Session Laws of 1909 is not invalid as an unlawful delegation of power to the state veterinarian, the said act establishing a system for quarantine or inspection, and conferring certain power upon the state veterinarian for the purpose of stamping out or preventing contagious diseases among domestic animals.

8. The provision of Section 2 of Chapter 164 of the Session Laws of 1909, which authorizes the seizure of cattle infected with a contagious disease, after reasonable notice by the state veterinarian to the owner and his failure to dip and properly treat and care for the infected cattle, and hold them for the actual expenses incurred in the seizure, and sell them as provided unless redeemed by the owner, is not void as violating the "due process of law" clauses of the State and Federal Constitutions, notwithstanding that an antecedent hearing before quarantine was not provided for, since the owner would not be concluded by the finding of the officer that quarantine was necessary, and that question, as well as the reasonableness of the officer's requirements as to treatment, could be litigated in any suit where the questions are properly in issue.

[Decided May 25, 1912.]                    (123 Pac. 918.)

On Reserved Questions from the District Court, Laramie County; Hon. Roderick N. Matson, Judge.

John Arbuckle and others brought an action in replevin against William F. Pflaeging to recover the possession of certain cattle which the defendant had seized as state veterinarian, in consequence of the failure of the owners after notice to observe certain official requirements of the defendant under the inspection and quarantine laws. A demurrer to the answer was overruled upon every point except as to certain constitutional questions, and those questions were reserved for the decision of the supreme court. The reserved questions and material facts are stated in the opinion.

*Gibson Clark* and *John D. Clark,* for the plaintiffs.

The enrolled act is not conclusive upon the regularity of the passage of a bill, but the legislative journals may be examined to ascertain whether in the passage any constitutional provision was violated, but the courts cannot go beyond the enrolled act and the journals in determining that question. (State v. Swan, 7 Wyo. 166.) The purpose of the original bill is obvious. It was not intended to provide for the inspection of cattle, for the suppression of disease, for the quarantine or slaughter of animals found to be infected, or for any other sanitary measure. But its purpose was to relieve the state from the payment of compensation for animals destroyed by the state veterinarian. No new provisions to enforce sanitary or protective measures were proposed. The bill, in fact, was a repealing act. The Jefferis amendment had nothing whatever to do with the purpose of the original bill, but it was a sanitary measure, devoted entirely to the prevention of the spread of diseases among domestic animals, and giving to the state veterinarian additional and extended powers to that end, and, so far from reducing state expenditures, the amendment authorized an increase thereof. It is therefore contended that the adoption of the Jefferis amendment was such a change from the original purpose of the bill as to violate section 20 of Article III of the Constitution. While it is true that the original bill and the amendment related to the duties of the

state veterinarian, that cannot save the act.    The word "purpose" has a meaning much more restrictive than the word "subject."    (Fahey v. State, 27 Tex. Civ. App. 146, 11 Am. St. Rep. 182; People v. Lawrence, 36 Barb. 192.) Constitutions are prepared with the utmost care and every clause is to be considered in relation with every other clause. (Cohn v. Kingsley, 5 Ida. 416, 38 L. R. A. 86.)    But giving to the word "purpose" the extended meaning of the word "subject" the amendment violates said constitutional provision.    The subject was limited by the title, but that part of the title reading "relating to the duties of the state veterinarian" do not describe the subject of the bill, but describe merely the amended sections.    Under such a title the bill must be germane to the section amended.    (Hollibaugh v. Hehn, 13 Wyo. 269; Board v. Stone, 7 Wyo. 280; In re Fourth Jud. Dist., 4 Wyo. 133; Erwin v. State, 116 Tenn. 71, 93 S. W. 73; Stein v. Leeper, 78 Ala. 517.)

The journal entries are not sufficient to show the passage of the bill in the manner provided by section 25 of Article III of the constitution since they do not refer to the title of the bill as amended by interlineation.    (State v. Swiggart, 118 Tenn. 556, 102 S. W. 75; Lumberton v. Bond, (N. C.) 59 S. E. 1014; Walnut v. Wade, 103 U. S. 683; School Dist. v. Chapman, 152 Fed. 887.)    With reference to the signing of the bill by the presiding officer of the House the bill is identified by its original title and not by the title of the enrolled act, wherefore it is contended that the entry is insufficient.

At page 384 of the House Journal it appears that the amended bill had four sections, while the enrolled act has but three sections, and it is therefore contended that the veto provisions of the constitution is violated since the bill as presented is affirmatively shown not to have been the bill receiving the affirmative votes of the two houses of the legislature.    (State v. Swan, supra; State v. Deal, 24 Fla. 293, 12 Am. St. Rep. 204.)

The authority conferred upon the veterinarian by the law

here involved is an unconstitutional delegation of legislative power, since it authorizes him to determine when conditions exist which will put in operation statutory provisions, and also to determine what result shall follow his conclusion upon the existence of the conditions. (Koppala v. State, 15 Wyo. 398; State v. Burdge, 95 Wis. 390, 70 N. W. 347; Noel v. People, 187 Ill. 587, 52 L. R. A. 287; Schaezlin v. Cabaniss, 135 Cal. 466, 56 L. R. A. 733.) The act is also void as violating the due process of law clauses of the state and federal constitutions. (Richter v. State, 16 Wyo. 437.)

*D. A. Preston,* Attorney General, for the defendant.

To get a clear understanding of the "purpose" of the bill and amendment here assailed it is necessary to examine the original act, the sections amended by the bill being a reprint in the Revised Statutes, of Chapter 41 of the Laws of 1882, relating to domestic animals. The original act was entitled "An Act to suppress and prevent dissemination of contagious or infectious diseases among domestic animals." Its purpose was sanitary, and for the benefit of a large class of citizens. The original act was passed when conditions were somewhat different than in 1909, and the changed conditions called for different modes of suppression and prevention. The amendment offered to the bill changed the method. House Bill No. 137 does not appear positively to be a measure merely to save expense on the part of the state. It may be that the state may yet, without a statute requiring it, pay claims for slaughtered animals found to be equitable. Changing a sanitary statute by making the method of regulation cheaper for the state does not make the bill a financial one. The amendment was germane to the purpose and subject of the bill. (Airy v. Watson, 32 Ark. 414; Ry. Co. v. Mitchell, 37 So. 85; Hall v. Steele, 2 So. 650; 36 Cyc., 951; Cooley's Const. Lim. 142; State v. Mason, 55 S. W. 636; State v. Sloan, 66 Ark. 575; Vincenheller v. Regan, 64 S. W. 278.)

The second and third reserved questions are fully answered in the case of George Bolln Co. v. Irr. Co., 19 Wyo.

542, recently decided by this court. We do not regard the fifth entry in the House Journal with reference to this bill as affirmatively showing that the bill was originally composed of four sections, or that such should be considered the effect of the entry. The silence of the Journal as to section 4 would compel the conclusion that something had occurred to the section, whereby it was regularly eliminated from the enrolled act and printed bill. (McKennon v. Cotner, (Or.) 49 Pac. 956; Field v. Clark, 143 U. S. 649.) It seems to be clear that it was intended that an amendment to the proposed act should have a separate number, but we find it in the enrolled act and printed as part of the section containing the Jefferis amendment, and therefore it did not require a new number. An amendment separately offered or reported may be adopted as a single amendment. (36 Cyc., 951, Ann. 1912; State v. Pitts, 160 Ala. 133, 49 So. 441, 135 Am. St. 79.) The enrolled act as passed by both houses contained three sections, and there is, therefore, no showing that the section referred to in the House Journal could have had any effect upon the Governor's approval. The Wyoming case of State v. Swan and the Florida case of State v. Deal, cited in plaintiff's brief, are not in point upon the facts in this case. (In re Taylor, 53 Pac. 340; State. v. Francis, 26 Kan. 724.)

The statute properly considered and construed does not authorize the veterinarian to determine arbitrarily when the conditions exist for the operation of the statute. The regulation permitted by the veterinarian is a proper one under the police power of the state. Statutes cannot be enacted covering every individual case of contagious disease among domestic animals; the officer to whom is entrusted the enforcement of the law must be presumed to perform his work for the best interests of the state and its inhabitants. Before the veterinarian can act he must know that the animals are infected or exposed to infection. There is not, we submit, an unconstitutional delegation of power. (Ingram v. State, 39 Ala. 274, 84 Am. Dec. 782; Isenhour v.

State, 157 Ind. 517, 62 N. E. 40, 87 Am. St. 228; U. S. v. Williams, 6 Mont. 379, 12 Pac. 851; Reed v. Dunbar, 41 Or. 509, 69 Pac. 451; In re Flaherty, 105 Cal. 558, 38 Pac. 981, 27 L. R. A. 529; 8 Cyc., 831, 832; Richter v. State, 16 Wyo. 437.) The 8th, 9th and 10th reserved questions appear to be disposed of by the Richter case.

SCOTT, JUSTICE.

This action is in replevin and was brought in the District Court of Laramie County by plaintiffs in error as plaintiffs against the defendant in error as defendant to recover the possession of about 500 head of cattle in which they alleged ownership and the right to immediate possession and the wrongful and unlawful detention by the defendant; and that said cattle were not taken upon any legal process issued against them or either of them, and that they are not held for a tax; that demand for their possession has been duly made and refused. The defendant made and filed his answer in which he denied each and every allegation in the petition set forth and contained except such as are thereinafter specifically admitted and further answered as follows, viz:

"Defendant further answering said petition alleges that he is, and at all of the times hereinafter mentioned, was, the duly appointed, qualified, and acting State Veterinarian of Wyoming, and, as such, charged by the laws of said state with the performance of certain official duties, among which are the inspection and quarantine of live stock when necessary for the treatment or prevention of infectious or contagious diseases peculiar to live stock, and the establishment of regulations when necessary to prevent the spread of such infectious or contagious diseases. That the cattle referred to in plaintiff's petition are a part of a herd, the exact number of which is unknown to defendant, of which plaintiffs are the reputed owners, branded "L5" on the left side, and ranged in Laramie County, Wyoming, under the general charge of one Edgar Boice, who is represented to be the agent of plaintiffs.

That for more than one year prior to the commencement of this suit, the cattle so as aforesaid owned and ranged by plaintiffs, were infected with a disease known as scabies or mange, and the agent having charge of plaintiff's cattle had been notified repeatedly by defendant to dip said cattle according to the dipping regulations prescribed by Circular No. 5, issued by the State Veterinarian, April 27, 1909; that notwithstanding said notifications, the plaintiffs failed and refused to dip and treat their said infected, diseased, and exposed cattle, but continued to keep and range the same with cattle owned by other persons over a wide scope of territory in Laramie County, Wyoming; that on or about the 9th day of April, 1910, defendant in the performance of his official duties as State Veterinarian, employed assistants and proceeded to gather plaintiff's cattle from the range, and did thereafter roundup, gather, and dip 1,951 head of plaintiff's cattle, of which 1,499 were dipped twice, and 452 were dipped once.    That the labor, service, and materials necessarily used and employed in the said rounding up and dipping of plaintiff's cattle, entailed a considerable expense, to-wit, the total sum of $5,048.06, the payment of which was refused by plaintiffs and their said agent, Edgar Boice, whereupon defendant seized, took into his possession, and held 290 head of plaintiff's cattle, and advertised the same for sale in the manner prescribed by law in such cases, for the purpose of defraying the expense incurred in the rounding up and dipping of plaintiffs' cattle, as aforesaid, and was so holding said cattle pending his said intended sale thereof, or a sufficient number thereof, to defray said expense, and the expense of said sale, at the time the said cattle were taken from his possession under the replevin process issued and levied in this cause.    That by reason of the wrongful issuance and execution of said· replevin writ, and the removal of said cattle from defendant's possession thereunder, defendant has been damaged by plaintiffs in the sum of $5,048.06.

Wherefore, defendant prays that plaintiffs take nothing under their said petition, and that defendant have and recover judgment against plaintiffs and their sureties in the sum of $5,048.06 with interest and costs of suit."

To this answer the plaintiffs filed a general demurrer on the ground that the facts stated therein are insufficient to constitute a defense to the cause of action pleaded in the petition. The demurrer was argued and submitted to the trial court and upon consideration thereof that court made and entered the following order, viz:

"This matter now coming on for hearing upon the demurrer of plaintiff to the answer of defendant herein and the court having heard argument by counsel for the respective parties, it is hereby ORDERED that said demurrer be overruled so far as it involves the consideration of any question of law not included within the questions hereinafter reserved for the decision of the Supreme Court, to which order the plaintiffs at the time duly object and except.

Upon motion of the attorneys for the plaintiffs herein it is further ORDERED that this action be certified to the Supreme Court and be reserved for its decision upon the following important and difficult questions arising under the Constitution of the State of Wyoming and the Constitution of the United States and necessary to the final decision upon said demurrer, to-wit:

1. Did the Legislature violate Section 20 of Article III of the Constitution of the State of Wyoming in the passage of Chapter 164 of the Session Laws of Wyoming, 1909?

2. Was Chapter 164 of the Session Laws of Wyoming, 1909, enacted in accordance with Section 25 of Article III of the Constitution of the State of Wyoming?

3. Was Chapter 164 of the Session Laws of Wyoming, 1909, enacted in accordance with Section 28 of Article III of the Constitution of the State of Wyoming?

4. Was Chapter 164 of the Session Laws of Wyoming, 1909, enacted in accordance with Section 8 of Article IV of the Constitution of the State of Wyoming?

5. Do the second and third sentences of Section 148 of the Revised Statutes of Wyoming, 1899, as amended by Chapter 164 of the Session Laws of Wyoming, 1909, violate the provisions of the first section of Article XIX of the Constitution of the State of Wyoming?

6. Do the second and third sentences of Section 148 of the Revised Statutes of Wyoming, 1899, as amended by Chapter 164 of the Session Laws of Wyoming, 1909, violate the provisions of Section 1 of Article III of the Constitution of the State of Wyoming?

7. Do the second and third sentences of Section 148 of the Revised Statutes of Wyoming, 1899, as amended by Chapter 164 of the Session Laws of Wyoming, 1909, violate the provisions of Article II of the Constitution of the State of Wyoming?

8. Does the third sentence of Section 148 of the Revised Statutes of Wyoming, 1899, as amended by Chapter 164 of the Session Laws of Wyoming, 1909, violate the provisions of Section 6 of Article I of the Constitution of the State of Wyoming?

9. Does the third sentence of Section 148 of the Revised Statutes of Wyoming, 1899, as amended by Chapter 164 of the Session Laws of Wyoming, 1909, violate the provisions of Section 7 of Article I of the Constitution of the State of Wyoming?

10. Does the third sentence of Section 148 of the Revised Statutes of Wyoming, 1899, as amended by Chapter 164 of the Session Laws of Wyoming, 1909, violate the provisions of the Fifth Amendment to the Constitution of the United States?"

It will be observed that the trial court held the answer sufficient to show justification and withstand the demurrer under the provisions of Chapter 164, S. L. 1909. As that branch of the case involves no constitutional question it is not here for consideration. The first reserved question is with reference to the constitutionality of the act under Section 20, Article III of the Constitution which is as follows:

"No law shall be passed except by bill, and no bill shall be
so altered or amended on its passage through either house as
to change its original purpose."

House Bill No. 137, as originally introduced on February
5, 1909, is as follows:

"A BILL
For
AN ACT to amend and re-enact Section 150, and repealing
Sections 155, 156, 158 and 159 of the Revised Statutes of
Wyoming, 1899, relating to the duties of the State Veter-
inarian.

Introduced and read first time Feb. 5.   Referred to Com-
mitte of the Whole.
Given to Committee on Printing Feb. 6.

Be it enacted by the Legislature of the State of Wyoming:

Section 1.   That Sec. 150 of the Revised Statutes of Wyo-
ming of 1899, be amended and re-enacted so as to read as
follows:

"Sec. 150.   It shall be the duty of the State Veterinarian
to superintend the slaughter of such animals as may be
condemned, and also the destruction of the carcass, which
latter shall be by burning to ashes, and shall include every
part of the animal and hide, and also excrement as far as
possible.   He shall cause the said slaughter and burning to
be done as cheaply as practicable and shall pay the expense
from any contingent fund appropriated for his office, taking
proper vouchers for the same."

Sec. 2.   That Sections 155, 158 and 159 of the Revised
Statutes of Wyoming be and the same are hereby repealed.
H. B. No. 137."

The bill was amended in the House as follows: "In the
title of the bill, after the word 'Section' to insert the words
'one hundred forty-eight and' and in line four of Section 150
after the word 'condemned' insert the words 'Except sheep
and goats' and also by inserting in the bill section 2 as fol-

lows: Section 2. That Section 148 of the Revised Statutes
of Wyoming of 1899 be amended and re-enacted so as to
read as follows: In all cases of contagious disease among
domestic animals other than sheep or goats in this State,
the State Veterinarian shall have authority to order the
quarantine of the infected premises, and in case such disease
shall become epidemic in any locality in this State, the State
Veterinarian shall immediately notify the Governor of the
State, who shall thereupon issue his proclamation forbidding
any animal of the kind, among which said epidemic exists,
to be transferred from said locality, without a certificate
from the State Veterinarian showing such animal to be
healthy. Whenever it shall become known to the State
Veterinarian that a disease known as mange, itch or scabies
or any other infectious or contagious disease exists among
cattle, horses or domestic animals, except sheep and goats
of any county, district or section of the State, it shall be
the duty of the said Veterinarian to take such steps as will
prevent the spread of said disease within the State, and said
Veterinarian shall have power as a sanitary measure, to in-
spect and compel the dipping, spraying or other sanitary
treatment as may be determined by said Veterinarian of all
such animals in the State of Wyoming, or in any county,
district or section of said State, under such rules and regu-
lations as the said Veterinarian may adopt, and the said
Veterinarian may order the owner or owners or persons in
charge of such animals to dip, spray or otherwise treat all
or any part of such animals as said Veterinarian may find to
be infected or to have been exposed to mange or scabies or
other infectious or contagious disease.

If the owner or owners or persons in charge of such ani-
mals so ordered treated, shall after reasonable notice to be
determined by said Veterinarian, fail to dip, spray or other-
wise treat such animals as ordered by said Veterinarian,
then the said Veterinarian is hereby authorized to seize, or
cause to be seized, dipped, sprayed or otherwise treated,
such animals, and to hold and sell the same, or such part

thereof as may be necessary to pay all cost of said inspection, seizing, caring for, dipping, spraying or other treatment, together with cost of sale, and such sale shall be made at such time and place, and in such manner as may be prescribed by said Veterinarian after not less than three days' nor more than fifteen days' notice of the time, place and purpose of such sale has been given by said Veterinarian to the owner or owners or persons in charge of such animals, and in case personal service of such notice cannot be had within the county in which the animals are being held by such Veterinarians, then such notice may be given either by personal service outside of said county, or by advertisement in any paper selected by said Veterinarian; Provided, however, That the owner or owners of such animals so seized and held, may, at any time prior to such sale, recover possession of the same upon payment to the State Veterinarian of the amount of the costs incurred by order of the Veterinarian against such animals; and Provided, further, That any sum realized from the sale of such animals, over and above the amount of costs actually incurred against such animals, shall be returned by the Veterinarian to the owner of such animals, if known, or can by reasonable diligence, be found, otherwise to be placed in the estray fund subject to the laws."

It is here urged that this amendment which for convenience we shall designate as the Jefferis amendment and which is found in sec. 2 of the enrolled act (Chapt. 164 S. L. 1909) was for a different purpose than that contemplated by the original bill, i. e., H. B. 137 as originally introduced. In other words, that the purpose of the bill as originally introduced was changed in the course of its passage contrary to the provisions of Sec. 20, Art. III of the Constitution.

The section amended (Sec. 150) related to and made it the duty of the State Veterinarian to destroy the carcasses in a certain way of infected animals slaughtered by him or under his personal direction under the provisions of Section 149 of the R. S. to prevent the spread of the disease with

which such slaughtered animals were infected. The title of the amendatory act or H. B. 137 as originally introduced related to the duties of that officer under section 150. The Jefferis amendment to the bill (Sec. 2, Chap. 164, S. L. 1909) above set out also related to the duties of that officer, in the matter of quarantining and treating stock known to be infected with a contagious disease so as to prevent its spread. It is provided in Sec. 2 or the Jefferis amendment to the bill as enacted that "Whenever it shall become known to the State Veterinarian that a disease exists among cattle, horses or domestic animals, except sheep and goats it shall be the duty of said Veterinarian to take such steps as will prevent the spread of such disease in the State," &c. He is there given power and authority to compel spraying, dipping and other sanitary treatment as may be determined by him whenever it shall become known to him that such disease exists. If the owner, after reasonable notice, fails to comply with his directions he is empowered to seize the animals, treat them and hold them as security and sell them as therein prescribed for the expense of such treatment unless redeemed by the owner. It cannot be conceded for one moment that section 2 or the Jefferis amendment to the bill did not also refer to the duty of the State Veterinarian and the bill before as well as after this amendment related to the duties of that officer with relation to the prevention of the spread of infectious diseases among cattle, and for that purpose the first section authorized the killing of diseased animals when infected with certain diseases and destroying the carcasses, and the second section or Jefferis amendment directed the quarantining and treatment of cattle when infected with scabies or other infectious disease therein named.

Sections 148 and 150 before and after amendment were not incongruous but related to the duties of the State Veterinarian with reference to stamping out or preventing the spread of infectious diseases among cattle, and sections 1 and 2 of the amendatory act were in furtherance of that

purpose, germane to and within the scope of the subject of
the bill. (Commissioners of Laramie Co. v. Stone, 7 Wyo.
280, 291, 51 Pac. 605.) We are therefore of the opinion
that the bill, as originally introduced, was not altered or
amended so as to change its original purpose as to come
within the inhibition of section 20, Article III of the Con-
stitution.

2. The second, third and fourth reserved questions may
be considered together. They involve the consideration of
whether the enactment of the law measures up the require-
ments of sections 25 and 28 of Article III and section 8 of
Article IV of the Constitution. Sections 25 and 28 are as
follows:

"Sec. 25. No bill shall become a law, except by a vote of
a majority of all the members elected to each house, nor
unless on its final passage the vote taken by ayes and noes,
and the names of those voting be entered on the journal."

"Sec. 28. The presiding officer of each house shall in
the presence of the house over which he presides, sign all
bills and joint resolutions passed by the legislature immedi-
ately after their titles have been publicly read, and the fact
of signing shall be at once entered upon the journal."

Section 8, Article IV, provides for presentation to and
the approval or veto by the Governor of every bill which has
passed the legislature. "If he approves he shall sign it."
It is unnecessary to set out the last section in full for the
Governor approved and signed the bill under consideration.
The answer to the fourth question, therefore, turns upon
the method of enactment and whether such method complied
with sections 25 and 28 of Article III, supra.

H. B. 137, as originally introduced, purported by its title
to amend and re-enact section 150, R. S., 1899. It was
regularly amended in the House by the insertion of the
Jefferis amendment, as it appears in section 2 of the act and
as it finally passed the House and by change of title to cover
the subject matter of that amendment and then ordered en-
grossed for third reading (House Journal 382-4). The en-

grossment committee reported H. B. 137 by number only among others as correctly engrossed under date of February 16, 1909 (H. J. 398). On that day under suspension of the rules a number of bills, including H. B. 137, were passed upon third reading and the ayes and noes and the names of those voting were entered on the journal. (H. J. 399.) On February 16, 1909, the following entry appears on page 402 of the House Journal, under the heading "Passed under suspension of rules." "H. B. No. 137—'A bill for an act to amend and re-enact section 150, and repealing sections 155, 156, 158 and 159 of the Revised Statutes of Wyoming of 1899, relating to the duties of the State Veterinarian,' was read third time, placed upon its final passage and passed by the following vote: (Setting out the ayes and noes.)

"And so, the bill having received the affirmative vote of a majority of all the members elected to the House, Mr. Speaker declared said H. B. No. 137 passed." (House Journal, 402.) On February 17, 1909, a House communication was received by the Senate that certain bills had passed the House, including "House Bill No. 137—A bill for an act to amend and re-enact sections 148 and 150 and repealing sections 155, 156, 158 and 159 of the Revised Statutes of Wyoming of 1899, relating to the duties of the State Veterinarian." (Senate Journal, 338.) The bill was regularly passed by the Senate under the amended title and so communicated by the Senate to the House on February 20, 1909. (H. J., 573.) On the same day the House Enrollment Committee reported H. B. 137, giving the number only, as correctly enrolled as Enrolled Act 96. (H. J., 581.) On February 20, 1909, under the heading "Signing Enrolled Acts" appears the following: "Mr. Speaker announced that he was about to sign * * * E. A. No. 96, House of Representatives 'An act to amend and re-enact section 150, and repealing sections 155, 156, 158 and 159 of the Revised Statutes of Wyoming, 1899, relating to the duties of the State Veterinarian. * * * And Mr. Speaker did in the presence of the House affix his official signature to each

and all of said Enrolled Acts." (H. J. 581, 582.) No question is made as to the regularity of the passage of the bill under the amended title in the Senate and the signing of the Enrolled Act by the President of the Senate and its approval by the Governor.

It will be observed that the bill was referred to by number and original title in the journal of the House before and after the Jefferis amendment, with the exception of the reports of the committees on engrossment and on enrollment which referred to it by number only. We have held that the bill was regularly and properly amended, both as to title and subject in the House wherein it originated. The report of the Committee on Engrossment designated it as House Bill 137. These matters affirmatively appear from the entries in the House Journal. In the case of George Bolln Co. v. North Platte Valley Irr. Co., 121 Pac. 22, recently decided by this court, there was a conflict in the journal recital of the title in the Enrolled Act. This court said: "Either the recital that the bill there signed (by the President of the Senate) was 'House Enrolled Act No. 73' or that it was 'House Bill No. 96—A bill for an act' &c. is erroneous. We must therefore look beyond the single journal entry for evidence as to which of the two is correct." An examination of the Senate Journal showed that House Bill No. 96 never passed the Senate and did not become an enrolled act and could not properly have been signed as such while House Bill 69 was regularly passed and was a part of the enrolled act. The act was upheld notwithstanding the conflict appearing with reference to the journal entries as evidence of what was actually done. While a journal entry is evidence to be considered in determining the question here presented, we are not limited by the recital of a single journal entry if upon construing all the entries together it is manifest that such single entry is erroneous or incomplete and notwithstanding that fact upon all the entries the provisions of the Constitution have been complied with. We may and should take into consideration in determining this

question the condition of the bill at the time the vote upon its final passage was taken. At that time it is shown to have been correctly engrossed. It had been regularly changed and amended and while the Clerk of the House failed to enter the complete and amended title in the journal as it existed at and subsequent to its reference to the Committee on Engrossment that committee subsequently reported the bill by number as correctly engrossed. That report, if true, and we think it must be so taken, would show that the engrossed bill contained all amendments both as to title and the body of the bill, otherwise it was not correctly engrossed. The journal entry shows that when the bill came up for third reading and was put upon its final passage that it was read. We are of the opinion that the entire bill, as it then existed, was before the House and the vote was upon the final passage of House Bill 137 as engrossed and read notwithstanding the failure of the clerk to enter the title in full. The bill having received the vote in favor of its passage of a majority of the members duly elected and the names of those voting by "ayes" and "noes" having been entered upon the journal it follows that section 2 of the act or the Jefferis amendment was voted on as well as other parts of the bill, and passed the House as a part of the bill in accordance with section 25, Article III of the Constitution of this State.

It was necessary that the Speaker of the House, in the presence of its members, sign the bill immediately after its title had been publicly read, and the fact of such signing be at once entered upon the journal. (Sec. 28, Art. III of the Constitution.) The same provision applies to signing the bill by the President of the Senate. No question is here made as to the compliance of the President of the Senate with this provision, but it is urged that the Speaker of the House failed to comply therewith. After the bill had passed the House it was referred to the Enrollment Committee and thereafter reported out of that committee by number only as House Bill No. 137 correctly enrolled as

Enrolled Act No. 96. (House Journal, 581.) The follow-
ing entry appears in the House Journal at pages 581 and
582 under date of February 20, 1909, and under the heading
"Signing Enrolled Acts," viz: "Mr. Speaker announced
that he was about to sign * * * E. A. No. 96, House of
Representatives, 'An act to amend and re-enact section 150,
and repealing sections 155, 156, 158 and 159 of the Revised
Statutes of Wyoming of 1899, relating to the duties of the
State Veterinarian.' * * * And Mr. Speaker did, in the
presence of the House affix his official signature to each and
all of said Enrolled Acts." This recital shows that the
Speaker did in the presence of the House affix his official
signature to Enrolled Act No. 96 and the act itself bears
his official signature. The fact of such signing was entered
upon the journal. It is not recited upon the journal that
the title had been publicly read and that the signing of the
bill in the presence of the House was immediately after such
reading, other than by inference from the history of the
bill and the recital that Mr. Speaker announced that he was
about to sign Enrolled Act No. 96, House of Representa-
tives, "An act to amend and re-enact section 150 and re-
pealing section 155" and other sections. In Bolln v. North
Platte Valley Irr. Co., supra, the question of the compliance
with this provision of the Constitution by the President of
the Senate was before this court. It is there said: "The
only entry found in the Senate Journal with reference to the
signing by the President of the Senate of the act in ques-
tion is found on page 521, Senate Journal, 1909, under the
heading "Signing Enrolled Acts" and is as follows: 'Mr.
President thereupon gave notice that he was about to sign,
and did thereupon in the presence of the Senate, affix his
official signature to the following enrolled acts, to-wit:
* * * House Enrolled Act No. 73, original being: House
Bill No. 96—'A bill for an act relating to the issuance of
certificates of appropriation under permit, and to the use of
the waters of the State of Wyoming for power purposes.' "
The error in this entry was that it gave the wrong number

of the original bill and the wrong title. · By reference to the
journal entries it was found that House Bill No. 96 as en-
titled never passed the Senate, but that House Bill No. 69
passed both houses and as passed was enrolled as Enrolled
Act No. 73, which was in fact House Bill 69.    This court
says: "The Senate Journal recites that the President of the
Senate gave notice that he was about to sign and did then
sign certain enrolled acts. Then follows the description of
the bills there signed, and in each instance the number of the
enrolled act is given as well as the other description; and,
had the journal in this instance contained the number of the
enrolled act only, it would no doubt have been sufficient.
*  *  *  However the error in the Senate Journal may have
occurred, we think the recital in the journal which is sup-
ported by the enrolled act and by all other recitals in the
journal with reference to the bill must be taken as speaking
the truth, and that the other description of the bill must be
rejected as the erroneous one." The facts of that case are
nearly identical with the case here. The only difference is
that in that case the description of the bill in the journal
entry by reference to number and title was wholly erroneous,
while in the case here the description by number was correct
and by title incorrect because incomplete. This clearly ap-
pears from the enrolled act and the other journal entries.
The entry shows that the Speaker signed Enrolled Act No.
96 in the presence of the House, after his announcement
that he was about to sign it, and as a condition precedent to
doing so, section 25, Article III, supra, required him to so
sign immediately after the title had been publicly read. If
the title of the bill constituting the enrolled act was publicly
read immediately before the Speaker affixed his official sig-
nature thereto then the provisions of this section were com-
plied with and the error was in the failure to correctly record
that fact in the journal. The section of the Constitution
does not specifically require the fact that the title was pub-
licly read to be recorded in the journal but does require the
fact of signing the bill to be immediately entered upon the

journal. We think there is a presumption that obtains that when a Speaker publicly affixes his official signature to a bill which has regularly passed the House over which he presides and in the presence of its members that the title of the bill as it appears in the enrolled act as a condition precedent to such signing, if publicly read at all must have been read in its entirety. In the case here the journal entry shows that it was at least partially read and if read at all from the enrolled act, as it must have been, then there is every reason to assume that the Speaker performed his duty by signing the bill immediately after the complete title as given therein was publicly read. There is nothing in the journal that indicates that the descriptive matter in the bill was not completely read. On the contrary, taking into consideration the entry as far as it goes in connection with the bill as passed, signed by the Speaker of the House and the President of the Senate and approved by the Governor and lodged in the office of the Secretary of the State and other journal entries with reference to its introduction and passage the presumption is the other way. The vote upon the passage of House Bill 137 as correctly engrossed was upon the entire bill as read at the time when such vote was taken as shown by the House Journal entries. As originally introduced, the bill then had no existence separate and apart from the amendment and could not properly and correctly be enrolled without the latter. In principle, the same question was so decided by this court in Bolln v. North Platte Valley Irr. Co., supra.

3. The fifth, sixth and seventh reserved questions involve the validity of the second and third sentences of section 148 of the Revised Statutes as amended by Chapter 164 of the Laws of 1909, under the provisions of the first section of Article XIX, section 1 of Article III and Article II of the Constitution which are respectively as follows:

Sec. 1, Art. XIX. "The legislature shall pass all necessary laws to provide for the protection of live stock against the introduction or spread of pleuro-pneumonia, glanders, splenetic or Texas fever, and other infectious or contagious

diseases. The legislature shall also establish a system of
quarantine, or inspection, and such other regulations as may
be necessary for the protection of stock owners, and most
conducive to the stock interests within the state."

Sec. 1, Art. III. "The legislative power shall be vested
in a senate and house of representatives, which shall be des-
ignated 'The Legislature of the State of Wyoming.' "

Sec. 1, Art. II. "The powers of the government of this
state are divided into three distinct departments: the legis-
lative, executive and judicial, and no person or collection of
persons charged with the exercise of powers properly be-
longing to one of these departments shall exercise any
powers properly belonging to either of the others, except
as in this constitution expressly permitted."

We need not here repeat the second and third sentences
of section 148 as amended but refer to those sentences in the
section as they appear in another part of this opinion. It is
contended that these sentences constitute an unlawful dele-
gation of power. The first sentence of section 1 of Article
XIX, supra, in substance lodges with the legislature the
power to provide for the protection of live stock against the
introduction or spread of all infectious or contagious
diseases. By the second sentence it is empowered to estab-
lish a system of quarantine, or inspection, and such other
regulations as may be necessary, &c. Laws enacted under
and in pursuance of this Constitutional provision are in the
nature of police regulations and that being so it is not a
delegation of legislative power to the officer or agent
through which the state acts in such matters. The legisla-
ture enacts the regulations and the state acts and enforces
the same through its agent, duly appointed or selected for
that purpose. The regulations here made are statutory.
They are not made by the agent or State Veterinarian. As
to what constitutes a reasonable notice in each particular
case within which the owner shall dip or treat his infected
cattle rests in the sound judgment of the Veterinarian in
the first instance. His judgment, however, is purely that

of an administrative officer and is not final but is subject to review. He can not use his power arbitrarily nor oppressively but must act within the provisions of the law, and when his act is beyond and outside the authority reposed in him by statute such act is void. It was so held with reference to a sheep inspector in Richter v. State, 16 Wyo. 437, 95 Pac. 51. In that case the statute, sec. 2087, as amended and re-enacted, Ch. 98, S. L. 1905, provides "that any inspector, either Federal or State, shall have authority to inspect and quarantine and treat sheep affected with contagious or infectious disease, or suspected of being so affected or that have been so exposed to any such disease." At page 443, Vol. 16, Wyo. Rep., at page 52 of 95 Pac., we said: "It will be observed that the inspector's authority to quarantine sheep is expressly conferred by statute, and in the matter of quarantining sheep because infected with or because they have been exposed to infectious diseases he is the agent of the state. A conferred power of this nature is not inhibited by the Constitution because it is the method and practically the only method by which the state can enforce its police regulations. The law is essentially of that nature and the protection sought and the object to be attained must be by a summary method and the state must act and act quickly through its agents who are clothed with certain powers in the performance of the duty. The power can not be used arbitrarily nor oppressively but only in such cases and in the manner prescribed by the statute, which being penal in its nature must be strictly construed." With equal force the language there used may be applied to the case here. There is nothing in the sentences of the act under consideration which authorizes the Veterinarian to act arbitrarily or oppressively, but on the contrary he is authorized to take only such steps as the statute requires upon discovery or knowledge of the existence of any infectious disease to prevent its spread. The act is continually in force and is not suspended or vitalized by any act of the State Veterinarian. It is his guide at all times and enables him

to meet conditions as they may arise when he would be powerless in the absence of such act. It does not delegate legislative powers to him but provides what shall be done on ascertaining the existence of certain facts. (Koppala v. State, 15 Wyo. 398, 89 Pac. 576, 93 Pac. 662.) It is in the nature of a police regulation and as such is not inhibited by section 1, Article XIX, section 1, Article III, nor section 1, Article II, of the Constitution.

4. The provision of section 2 authorizing the seizure of the infected cattle, after reasonable notice by the State Veterinarian to the owner and his failure to dip and properly treat and care for the infected cattle, and hold them for the actual expenses thus incurred and sell them as provided unless redeemed by the owner are assailed under reserved questions 8, 9 and 10 as being void under the due process of law clauses of the State and Federal Constitutions, viz: Sections 6 and 7, Article I, Constitution of the State of Wyoming and Amendment V to the Constitution of the United States.

The failure of the statute to provide for an antecedent hearing before quarantine was not fatal thereto for the owner would not be concluded by the finding of the officer as to the necessity of a quarantine. That question, as well as the reasonableness of his requirements as to treatment, could, as we have already intimated, be litigated in any suit when those questions were properly in issue.

The last sentence of section 2, as it appears in Chapter 164, S. L., 1909, relates to fees and the amounts thereof to be collected for inspection of stock imported into the state appears to be the Winkleman amendment and was intended to constitute section 3 of the bill. Its validity is not here involved nor is it germane to the discussion of the reserved questions hereinbefore discussed.

To each of the reserved questions numbered 1, 5, 6, 7, 8, 9 and 10, respectively, this court answers "No" and to reserved questions numbered 2, 3 and 4, this court answers "Yes."

Beard, C. J., and Potter, J., concur.