Jeramiah OPIE, also known as Jerry Opie, Appellant (Defendant below),

v.

The STATE of Wyoming, Appellee (Plaintiff below).

No. 3167.

Supreme Court of Wyoming.
March 3, 1964.

Lawrence A. Marty, Green River, J. Reuel Armstrong and Kenneth W. Keldsen, Rawlins, for appellant.

Dean W. Borthwick, Deputy Atty. Gen., Cheyenne, and Joe R. Wilmetti, Former County and Pros. Atty. of Sweetwater County, Rock Springs, for appellee.

Before PARKER, C. J., and HARNSBERGER, GRAY and McINTYRE, JJ.

Mr. Justice HARNSBERGER delivered the opinion of the court.

An information charged Jeramiah Opie, also known as Jerry Opie, did unlawfully, purposely, and with premeditated malice kill and murder his wife, Iris Opie. Defendant, tried by a jury, was found guilty of murder in the first degree, without capital punishment, and the court sentenced Opie to life imprisonment. He now appeals, claiming reversible error for: (1) failure to direct a verdict of acquittal at the close of the State's case and after both he and the State rested, because the evidence did not show beyond a reasonable doubt that deceased came to her death by means inconsistent with defendant's uncontradicted testimony; (2) lack of competent evidence of premeditation and motive; (3) failure to dismiss charge of second degree murder as there was a lack of evidence of purpose, malice, or motive; (4) failure to dismiss charge of manslaughter as there was a lack of evidence of any quarrel or sudden heat of passion or criminal negligence or unlawful act; (5) receiving in evidence a gunbelt and holsters, a 44 calibre magnum hand-gun, and five gunpowder-pattern test sheets of blotting paper, without foundation being laid; (6) giving Instruction No. 8, because it stated, "absolute certainty in establishment of any fact is rarely attainable and never required in courts of justice"; (7) giving Instruction No. 30, as it inferred jury should compromise its verdict; (8) refusing Instruction A, which said evidence of defendant's threats toward one other than deceased should not be considered; (9) refusing Instruction B, which admonished jury to view with caution testimony as to oral admission or confession of defendant; (10) permitting sheriff's testimony as to how defendant's father obtained the 44 calibre hand-gun; (11) overruling defendant's objection to State's attempt to impeach and solicit testimony from a witness and placing answers in the witness' mouth; (12) permitting testimony of threats against witness; and (13) because information did not allege facts to prove involuntary manslaughter, unlawful act, culpable neglect, or criminal carelessness.

In considering appellant's first point, it should be borne in mind that verdicts of acquittal are only directed when in the court's opinion there is no substantial evidence to sustain the material allegations of the information. It is not the province of the court to determine "beyond a reasonable doubt" any disputed fact.

At the close of the State's case, the evidence showed that sometime after 4 o'clock the morning of March 24, 1962, Iris Opie, defendant's wife, was found dead in the living room of an apartment occupied by the Opies, her lifeless body reclining in an overstuffed armchair with her legs and feet resting upon a large hassock or ottoman in front of the chair; that she was shot with defendant's 44 calibre magnum hand-gun revolver or pistol, the bullet striking Iris somewhat below her right eye, going at first straight back through her head,

and found in her matted hair at a point where her head rested against the top portion of the chair's back. The pistol was found to contain a spent cartridge under the hammer, then there was an empty chamber, and then a live round, counterclockwise.

The deceased's face showed no powder smoke or smudging which would be present if the muzzle of the gun had been within 18 inches of her face when the fatal shot was fired, but deceased's face did have upon it small particles of unburned powder which indicated the muzzle of the weapon was within a distance of approximately 3½ feet from the victim's face when it was fired. After the body of deceased was found, defendant came into the room and started toward her, when an officer grabbed defendant by the arm and told defendant to sit down and take it easy. The defendant then said, "Where I'm going I won't have to relax," and when an officer was taking defendant from jail, defendant said, "You fellows said all along that some time I would kill someone. Now you have me on the big one." When defendant was not permitted to stop at the mortuary where his wife's body was, defendant said, "Don't a condemned man have any rights at all," and asked how soon after trial the execution would be, and said "It's already cut and dried." When an officer approached defendant to arrest him, defendant said, "I have been waiting for you. I won't run away from you. I really fouled up this time. I shot her, I loved her and I should go to the gas chamber." About 1 to 2 o'clock in the morning, before the shooting, defendant asked a witness if he ever felt like killing anyone—how the witness felt when he and his wife were splitting up and if the witness was mad enough to kill his wife, and defendant said that he would like to try his gun on something—that he was going to kill someone that night, and defendant asked if the witness had ever caught the witness' wife "shacking" with another man, and asked if witness felt like killing the witness' wife when he caught

her (shacking up with another man), and that he, the defendant, was going to kill someone before the night was over. To this evidence there was added testimony that defendant had become extremely angry at an acquaintance of deceased, went to his home and said, "Come on, let's go." "I'm going to kick your head in"; that on March 23, 1962, this acquaintance of deceased had delivered some cards to the apartment building in which the Opies lived, and later defendant told the acquaintance someone had informed defendant the acquaintance had been "down there." Finally, the eight-year-old son of the deceased testified that the night his mother died he had awakened and heard his mother crying, heard defendant say, "Shall I pull the trigger now?" and heard his mother say, "Go ahead"; that he heard the "lever" go back and then he went to sleep. There is absent from the record any testimony or evidence to show how much time elapsed from when the boy heard this conversation and heard the lever go back, until the shot was fired, but his testimony was that he went to sleep and did not hear the shot which may have indicated to the jury that the shot was fired some time later. Photographs showing the deceased in the position she was found, the wound upon her face, the place where the spent bullet was found, the burnt-powder peppering marks upon her face, test sheets showing effects of shots fired from defendant's gun, and the gun itself were also in evidence.

This brief résumé of the evidence most favorable to the State's case was ample, substantial, and sufficient when accompanied by fair and just inferences, reasonably drawn, to be submitted to the jury and to deny appellant's motion made at the close of the State's case for a directed verdict of acquittal.

Additional evidence supplied upon presentation of defendant's case showed that about 5 o'clock the morning of March 24, 1962, defendant was at the home of his parents with the magnum pistol in his hand; that defendant put the gun down, his father

picked it up, put the gun on the floor of the father's car, and later turned it over to the sheriff, and defendant said something about Iris being hurt. The father then went to defendant's apartment, found the door open, entered, and saw Iris reclining in the chair as though asleep. He felt her hand, phoned the sheriff, left the apartment, and locked the door. Later the father returned to defendant's apartment with his wife, found police officers and a doctor there; the officers took pictures, and the father gave the sheriff the gun. Defendant's father testified, "Nobody touched anything until officers arrived."

While the jury was not required to accept defendant's testimony as to what happened, in order to portray the conflicts shown by the State's evidence with defendant's version of what had occurred, the defendant's story will be briefly stated. According to defendant, the night of the shooting he had a large number of drinks and after 4 a. m., went home. When he entered his apartment he found his wife sitting in the chair with the ottoman in front of it, and she said "Jerry," "If you don't quit your running around," and again, " 'If I didn't quit my running around and drinking' " that she was going to shoot herself; that she "came up with this gun of mine" with her hands on the grip and started to raise the gun up to her forehead; that defendant grabbed the gun with his right hand around the chamber, then grabbed the gun with his left hand "like this"; then deceased grabbed the gun on the end of the barrel with her left hand and started to pull the gun down; they struggled; he "started to lose grip a little bit," and the gun went off; defendant didn't have the gun in his hands "Because I bent over," and "I put my hands on her face like this and the blood started to roll down"; that defendant barely had a grip on the gun and "the only thing I know is that I had ahold of the gun"; then he went to his parents' home; defendant did not know if his wife was wounded or hurt or dead; he did not call a doctor; he did not move his wife after the gun went

off; and she was in the same position "As when I first walked into the house."

Under the evidence, when the fatal shot was fired the muzzle of the gun must have been at least, if not more than, 18 inches from the face of deceased or its firing would have left smoke-smudging on her face, and the peppering or tattooing from unburned powder particles found on her face would have been more concentrated and more evenly distributed than they were, and the burned particles of powder would have adhered more tightly to the skin. As there was no such smoke-smudging or concentration and even distribution of particles of burned powder adhering tightly to the skin of deceased's face, the obvious conclusion available to the jury was that at the time of firing the lethal weapon its muzzle was at least 18 inches or more away from the face of the deceased.

As previously stated, the peppering or tattooing from unburned powder would not be present when the muzzle of the used weapon was more than $3\frac{1}{2}$ feet from the target. The jury was therefore also entitled to believe that the shot which took deceased's life was fired when the muzzle of the gun was at a distance of more than 18 inches but less than $3\frac{1}{2}$ feet from the face of the deceased. Other testimony showed it took an average amount of pressure on the trigger to discharge the weapon and that the trigger-pull was not unsafe. Taken altogether, with reasonable inferences, the evidence was substantial and sufficient to warrant the jury's concluding the pistol was not fired by the deceased. Photographic evidence of the victim showing her reclining in the armchair with her legs and feet extended and resting on the ottoman in front of the chair was ample to show the jury she was not a large person or that the length of her arms gave her an unusual or abnormal reach. The gun which has quite a long barrel was before the jury. From all the evidence submitted to it the jury was therefore entitled to conclude, as it evidently did, that it would have been physically impossible for the deceased to

have held the gun in the manner described by the defendant, so aimed that the bullet went "straight back" and at the same time have the muzzle of the weapon 18 or more inches distant from her face when it was fired. There was nothing in this defense evidence to require a directed verdict of acquittal and the denial of the second motion was correct.

Appellant's point (2) is not well taken. While motive is frequently an aid in the solution of a criminal act, it is not a positive requirement that motive be proved. However, in this case, the circumstances developed by evidence did show a motive as well as premeditation. Defendant had been told that a former acquaintance of the deceased was seen shortly prior to the killing at the apartment building where the Opies resided; that defendant had previously shown his hostility toward that acquaintance; that his statements to others, made just before the deceased was shot, indicated he was thinking about wives being unfaithful; that he was asking if another man whose wife had been unfaithful became mad enough to kill his wife when the wife was caught being unfaithful; that defendant then said he was going to kill someone before the night was over; and his overheard query to his own wife, "shall I pull the trigger now?" were compelling evidences that, whether it was true or not, he felt his wife was unfaithful, that he was mad, and that he had in mind the purpose to kill, followed closely by the fatal shooting of his wife. All this gave reasonable and fair inference that defendant had formed the purpose to kill and murder his own wife and that the act was premeditated and consummated with legal malice. This adversely disposes of appellant's point (2).

It also rules against appellant's point (3).

Point (4) is deemed so lacking in merit that it is overruled without comment.

As little significance seems to have attached to the gunbelt and holsters, their admission in evidence even if without sufficient foundation would not amount to reversible error, but the nature of the crime and their presence at the scene of crime, was sufficient foundation when so determined by the trial judge whose discretion in such a case should not be too narrowly limited. It is enough to say that as the 44 calibre magnum gun was stipulated to be the defendant's, and its identification as being the weapon from which the death-dealing shot was fired, provided ample foundation for its admission in evidence. The five gunpowder-pattern test sheets of blotting paper which were identified, explained and testified about in the testimony of a witness who was accepted without defense objection as a qualified ballistic expert and who was the person who made the tests exhibited by the sheets, were thereby adequately authenticated as worthy of acceptance in evidence to illustrate the testimony given by the witness, and therefore a sufficient foundation was provided for their admission in evidence. Thus appellant's point (5) is unavailing to him. Thrawley v. State, 153 Ind. 375, 55 N.E. 95, 99; 4 Chamberlayne, Modern Law of Evidence, § 3171, p. 4391 (1913).

Appellant agrees that Instruction No. 8 is a correct statement of the law including its saying "absolute certainty in the establishment of any fact is rarely attainable and never required in courts of justice." See Cornish v. Territory, 3 Wyo. 95, 97, 3 P. 793, 795; Gardner v. State, 27 Wyo. 316, 323, 196 P. 750, 751, 15 A.L.R. 1040. But appellant says the instruction is erroneous because the inference is given that there is doubt of defendant's innocence, especially as there were 33 instructions given, a majority of which dealt with guilt. Upon a careful reading of all of the instructions and considering them as a whole, as the jury was directed to do, no such inference is found. Point (6) is overruled.

Instruction No. 30 tells the jury that each juror should give careful consideration to the views of the other jurors respecting the testimony in the case, not to shut his ears and stand stubbornly upon the position he first takes regardless of what may be said by other jurors, and instructed

that it should be the object of all to arrive at a common conclusion. Appellant says this suggests a compromise or majority verdict.

If jurors were not expected to consult together, exchange views and try to reach a conclusion common to all, there would be no purpose in having them retire together and discuss the evidence. It would be enough for them to separately and secretly cast their respective ballots and the verdict abide the result. There is a vast difference in listening with an open mind to the views of fellow jurors before reaching a conclusive opinion and to compromise, for the latter means a juror would forego a fixed conviction merely to reach agreement. Point (7) is rejected.

■■■■ Instruction A, offered by appellant, was properly refused. Although the court refused this instruction because it felt the record failed to show there was any threat to a person other than the deceased, there is a further reason for which the instruction was properly refused. There was testimony that indicated defendant resented a male acquaintance of the deceased and told that acquaintance defendant was going to "kick his head in." If this is taken to be a threat to a person other than the deceased, it was not only admissible in evidence under the circumstances, but it should have been considered as bearing upon defendant's state of mind and his feelings not only against the acquaintance but also his feelings regarding his own wife, the deceased. A threat against a third person is admissible when circumstances are shown which indicate some relation or connection between the homicide and the third party threatened. There was substantial evidence that justified a conclusion that defendant was jealous of what he thought were the attentions paid his wife by the person defendant threatened and that he at least suspected impropriety in their relations. The admissibility of these threats come within the rule discussed in 40 C.J.S. Homicide § 206 c, p. 1111; 26 Am. Jur., Homicide, § 359, p. 404; and in State v. Spears, 76 Wyo. 82, 106, 300 P.2d 551,

560, 561, and were entitled to be considered by the jury. Appellant's point (8) is overruled.

■■■■ The trial court refused Instruction B because it was felt the matter of credibility of witnesses was adequately covered by other instructions given. We agree. The refused instruction read:

"The Court instructs the jury that the law of this state admonishes you to view with caution the testimony of any witness which purports to relate an oral admission or confession of the defendant or an oral confession by him."

This singled out testimonies regarding admissions or statements made by defendant and told the jury to give special attention to the credibility of those witnesses who testified to such admissions or statements. Point (9) is therefore overruled.

■■■■ Appellant's point (10) is that the sheriff was permitted to give hearsay testimony as to where and from whom defendant's father received the gun. The record does not show any objection was made to any specific question asked or answer given by the sheriff which violated the hearsay-evidence rule. The only objection made in this connection followed the incomplete question, "And then did he take it from—" At this point defense counsel said, "Just a minute, I object. This is hearsay as to what he said relative to this matter, and ask what he has testified be stricken out." If the previous examination of the sheriff relative to the matter is considered as subject to this defense request for striking, it should be said the purport of that examination was to explain why no investigation was made as to possible fingerprints upon the gun, the witness testifying that this was because the gun was not at the scene; had apparently been removed; and that witness knew defendant's father had handled the gun because the father had told him. It appears from the record that upon previous cross-examination of the witness, the defense opened the subject by inquiring how the witness knew the fingerprints would have no

value. Under these circumstances the State was allowed to let the witness explain how that knowledge was gained. Appellant's point (10) shows no error.

■ Appellant next complains that the State attempted to impeach one of its own witnesses; and of suggesting answers to the witness by reading to him his previous statements recorded on tape but not signed or verified by him. The record shows that after the witness was permitted to read what was referred to as his former statement, he was asked if that refreshed his memory as to the exact wording and if it was correct. Upon his replying that it was correct, the witness explained that his testimony about "shacking" meant catching his wife with another man. This refreshing of the witness' recollection has no semblance of impeachment and is a far cry from suggesting his answers. No merit is found in appellant's point (11).

A complete answer to appellant's point (12) is given under what is said with reference to point (8).

Point (13) is completely without merit.

Finding no error in the record, the verdict of conviction without capital punishment and the judgment and sentence pronounced thereon are affirmed.

Affirmed.