Albert CHAVEZ, Jr., Appellant
(Defendant below),

v.

The STATE of Wyoming, Appellee
(Plaintiff below).

No. 5103.

Supreme Court of Wyoming.

Oct. 15, 1979.

Michael K. Shoumaker of Badley, Rasmussen, Shoumaker & Newton, Sheridan, for appellant.

John D. Troughton, Atty. Gen., Gerald A. Stack, Deputy Atty. Gen., Crim. Div., and Bob R. Bullock, Sr. Asst. Atty. Gen., for appellee.

Before RAPER, C. J., and McCLINTOCK, THOMAS, ROSE and ROONEY, JJ.

THOMAS, Justice.

In this unique case the primary argument concerns the sufficiency of the evidence to justify the denial by the trial court of a motion for a judgment of acquittal at the close of the trial on a charge presenting alternative theories of first degree sexual assault under § 6–4–302(a)(i) and (iii) W.S. 1977. The appellant also argues the unconstitutionality of the sexual assault statute, asserting that it violates established due process principles and is void because of vagueness. We conclude that the evidence was not sufficient to submit this case to the jury, and we will reverse and remand the case for the entry of a judgment of acquittal. This disposition makes it unnecessary to consider the constitutional attacks, and the disposition of those issues must await a future case in which there is sufficient evidence to sustain a conviction under the statute as adopted.

The Information charges:

"[T]hat Albert Chavez, Jr. * * * on the 3rd day of September, A.D.1978 at the County of Sheridan in the State of Wyoming, did inflict sexual intrustion [sic] on a female victim wherein the victim was physically helpless and Albert Chavez, Jr., knew or should have reasonably have known, that the female victim was physically helpless and the victim had not consented; or wherein Albert Chavez, Jr., caused submission of the victim through the actual application, reasonably calculated to cause submission of the victim, of forcible confinement. (6–4–302(a)(i)(iii))"

The pertinent statute reads as follows:

"(a) Any actor who inflicts sexual penetration or sexual intrusion on a victim commits a sexual assault in the first degree if:

"(i) *The actor causes submission of the victim through the actual application, reasonably calculated to cause submission of the victim, of* physical force or *forcible confinement*; or

"(ii) The actor causes submission of the victim by threat of death, serious bodily injury, extreme physical pain or kidnapping to be inflicted on anyone and the victim reasonably believes that the actor has the present ability to execute these threats; or

"(iii) *The victim is physically helpless, and the actor knows or should reasonably know the victim is physically helpless* and the victim has not consented; [or]

"(iv) The actor knows or should reasonably know that the victim through a mental illness, mental deficiency or developmental disability is incapable of appraising the nature of the victim's conduct."
§ 6–4–302, W.S.1977. (Emphasis added.)

At the close of the evidence a motion for a judgment of acquittal was made by Chavez's counsel. At that time counsel contended that the evidence was not sufficient to demonstrate the forcible confinement relied upon under § 6–4–302(a)(i), and further that it was not sufficient to demonstrate that Chavez knew or reasonably should have known that the victim was physically helpless, relied upon under § 6–4–302(a)(iii). The motion was denied by the district court. The case then was submitted to the jury, which returned a finding of guilty of sexual assault in the first degree. Chavez was sentenced to a term of not less than six nor

more than twenty years in the State Penitentiary.

We preface our analysis of the evidence by noting that in dealing with the issue of the sufficiency of the evidence in the context of the denial of a motion for a judgment of acquittal we look only at the evidence which is favorable to the State together with all the logical and reasonable inferences which may be drawn therefrom. *Russell v. State*, Wyo., 583 P.2d 690 (1978); *Cloman v. State*, Wyo., 574 P.2d 410 (1978); *United States v. Burns*, 597 F.2d 939 (5th Cir. 1979). The record discloses through the testimony of a psychiatrist that the victim suffered from a phenomenon involving the development of the chemistry of the brain and nervous system which he said has been described under many terminologies, including minimal brain dysfunction, cerebral dysfunction, or minimal organic dysfunction. This is a condition which affects about five percent of the population at age six, but by age sixteen the incidence is reduced to about one-half of a percent. According to the psychiatrist this situation with this victim was exacerbated by emotional strain and trauma relating to her family background. It then was his opinion that in the circumstances involving Chavez and the victim, which will be discussed in more detail, a blocking occurred in the victim's mental processes which resulted in her being physically unable to communicate her unwillingness to be a participant in the activities Chavez was pursuing. She would have been passive in her response, or would have responded cooperatively according to the doctor.

Other witnesses, including the victim's father, her stepmother, and a Sunday School teacher, testified that when the victim was under stress, particularly when she was frightened, she was substantially immobilized. She would manifest no response, would become somewhat rigid in her movements, and would shake a little. There was a tendency on the part of the witnesses to summarize this condition of the victim as sort of freezing up.

On the occasion of the events in question the victim testified that she was reading magazines in the park in Ranchester, Wyoming. A car stopped at the picnic table and four men got out and went to an adjacent picnic table for awhile. They then came over to the picnic table where the victim was and one of Chavez's companions, Joe, sat beside her, put his arms around her, and took her hand. The victim said that she immediately stiffened up, and she could tell that Joe was very drunk. Joe pursued his advances to the point of kissing and hugging the victim. At some point during these activities he directed the other individuals to go to the bar, whereupon they left in the car. The victim testified that Joe bragged about his gun, advising that it was a big gun and that he enjoyed shooting it. It is not clear whether Chavez was present when these comments were made, but it seems that all parties assumed that Joe was alluding to a firearm. The victim testified that the statement contributed to her fright.

The other individuals, including Chavez, later returned in the car. At that time Joe stated to the victim, "We're going to Sheridan. Are you?" She testified that she just shrugged her shoulders. Joe then took her hand and led her to the car, where she was seated on the console between bucket seats. Joe was driving, and Chavez was in the right front seat. Joe started speeding as they went from the park outside of Ranchester toward Sheridan. During the course of the journey to Sheridan Chavez pushed up the victim's bra and started playing with her breasts. He then pulled down her pants and started pushing his finger into her vagina. She said that her reaction was that she "shrugged away" toward the driver a little. She testified she did not say anything because she was afraid of the defendant. Joe did tell Chavez to keep his hands off his girl, but Chavez did not desist in his activities, which continued for about fifteen minutes.

When they arrived in Sheridan the car stalled, and Joe assisted her out of the vehicle, and they started down the street to a disco establishment. Joe kept his hand on

her while walking down the street. The events were interrupted by a church acquaintance of the victim. The acquaintance asked her how she was doing, and she shrugged her shoulders. She testified that she did not ask for help because she was afraid. This acquaintance then contacted the victim's pastor, and together they called the victim's parents. After the telephone call, about fifteen minutes after the first contact, the acquaintance and the pastor saw the victim again leaving the disco establishment with Joe and one of the other men. Later they were contacted by a police officer, who had been alerted by the pastor and the church acquaintance, and the officer did talk with the victim. Chavez was arrested based upon the information which the officer obtained.

During the course of her testimony the victim said that Chavez did not cause her to get into the vehicle; he never told her she had to remain in the vehicle; and she never made any attempt to get out of the car. She remembers no conversation with Chavez whatsoever. She testified that she made no outcry; that she was not shaking; and that when asked if she wanted to go home by one of the other men she said, "Yes," and that man told Joe once or twice that she wanted to go home. She said that at one point she was ready to cry, but apparently she did not. She testified that Chavez did not hold her in the car; that he never said he was going to keep her in the car; and that he did not confine her in the car. She did not advise Chavez or any of these individuals about her emotional problem. In connection with the assault by Chavez, she said that she did not push his hand away; she did not push any of the rest of his body; and she did not even shake her head no.

On cross-examination, the psychiatrist was asked whether a layman could recognize the condition which afflicted the victim. He said that in the victim's case it would be hard for him to judge what the condition would appear to be through the average layman's eyes. He thought that another person would witness the victim as one who was not very verbal, kind of blank in appearance and passive in response. In answer to a series of questions, the psychiatrist testified that he would have to guess as to whether a layman would be able to recognize the victim's condition in the situation in which Chavez and his companions met her.

Chavez's statement of the issues with respect to the denial of the motion for a judgment of acquittal is:

"I. The District Court erroneously denied Motions for a Judgment of Acquittal because the evidence was insufficient to support a guilty verdict.

"A. There was no evidence of physical force.

"1. There was no evidence of the actual application of physical force.

"2. There was no evidence of forcible confinement.

"3. The lack of proof was obscurred [sic] by nonadmissable [sic] evidence.

"B. The State failed to prove the elements of Wyoming Statute 6–4–302(a)(iii).

"1. There was insufficient evidence that [victim] was 'physically helpless'.

"2. There was no evidence that Albert Chavez 'knew or should have known,' of [victim's] condition."

We do not recite the statement of the issues relative to the constitutional contentions.

■■■ Rule 30(a), W.R.Cr.P., provides in pertinent part as follows:

"(a) *Motion before submission to jury.*— Motions for directed verdict are abolished and motions for judgment of acquittal shall be used in their place. The court on motion of a defendant or of its own motion shall order the entry of judgment of acquittal of one (1) or more offenses charged in the indictment or information after the evidence on either side is closed if the evidence *is insufficient to sustain a conviction of such offense or offenses.* * * *" (Emphasis added.)

In prior cases we have held that if the evidence given the view most favorable to the State portends to establish guilt beyond

a reasonable doubt, it is for the jury to make the decision as to whether it actually does. We also have said that our court may only direct an entry of a judgment of acquittal when it may be said as a matter of law that there is no evidence of guilt whatsoever in the record or where there is no substantial evidence from which reasonable men may say that the defendant is guilty beyond a reasonable doubt. Viewing the evidence under the proper standard, however, the motion must be granted when the evidence is such that a reasonable juror must have a reasonable doubt as to the existence of any of the essential elements of the crime. Further, if the evidence is such as to permit the jury to merely conjecture or speculate as to the defendant's guilt, the trial judge should not allow the case to go to the jury. *Russell v. State*, Wyo., 583 P.2d 690 (1978). While the question raised by a motion for judgment acquittal is one which must be determined within the sound discretion of the trial court (*Montez v. State*, Wyo., 527 P.2d 1330 (1974)), and the entry of a judgment of acquittal is proper only when the court determines there is no substantial evidence to sustain the charges (*Fresquez v. State*, Wyo., 492 P.2d 197 (1971); *Opie v. State*, Wyo., 389 P.2d 684 (1964)), this court on review has the same duty or function. We, like the trial court, must determine as a matter of law whether there is sufficient evidence to sustain the charges. *Cloman v. State*, Wyo., 574 P.2d 410 (1978).

As we apply these principles to the facts of this case, we consider separately the alternative theories of the prosecution. We shall consider first the theory which results in guilt if the defendant inflicted sexual intrusion by causing the submission of the victim through the actual application, reasonably calculated to cause submission of the victim of forcible confinement. Recognizing that it is easier to glean these facts from the transcript of the evidence than it probably is to remember the testimony at the close of the trial, we note the following evidence: When the victim entered the vehicle Joe simply took her hand and led her to the car. No reasonable infer-

ence of force can be drawn from that act. When everyone had entered the vehicle the victim was seated on the console between Joe, who was driving, and Chavez. It literally is true that the victim was confined between these individuals, but no force was involved at the inception of that situation. Evidence of some change in the situation would be essential for the jury to infer forcible confinement. None appears in this record. The victim made no protest nor outcry, and nothing was said to her to demonstrate that a forcible confinement was intended by Chavez. The conclusive factor is best presented by these questions and answers upon cross-examination of the victim:

"Q. Did Albert Chavez ever threaten you?

"A. No.

"Q. Did he ever hold you in the car?

"A. No.

"Q. Did he ever say he was going to keep you in the car?

"A. No.

"Q. *Did he ever confine you in the car?*

"A. *No.*" (Emphasis added.)

We conclude that a determination by the jury of forcible confinement causing submission of the victim in this case would be contrary to the evidence before the court, and the issue of guilt should not have been submitted to the jury on that theory.

With respect to the alternative theory premised under § 6–4–302(a)(iii) of the statute requiring the State to prove beyond a reasonable doubt that the victim was physically helpless and that Chavez knew or should reasonably have known that the victim was physically helpless, we reach a similar conclusion. The record indicates that to a person who had been educated by prior acquaintanceship with the victim or to one who had special training in the field of psychology or psychiatry the victim's problem was subject to recognition. These witnesses were able to describe changes in appearance and demeanor that they would recognize as objective manifestations of the victim's physical helplessness which in turn

resulted in her passivity and her inability to vocally protest. The victim's testimony is to the effect that these objective manifestations were not present during the episode with Chavez and his companions. The only indication of their presence was her testimony that when Joe put his arms around her and took her hand she immediately stiffened up. It is problematic whether under those circumstances a stranger would recognize that as a manifestation of a sophisticated problem involving the development of the chemistry of the brain and nervous system. Again, however, the testimony of the witnesses directs our determination of the question whether as a matter of law there is sufficient evidence to sustain the charges. The expert psychiatric witness called by the State testified as follows on cross-examination:

"Q. Would this be fairly rare then? (Pause) Is this something the average layman would be familiar with?

"A. That's hard for me to answer; perhaps not. I think I was interrupted in explaining—

"Q. I'm sorry, I didn't mean to interrupt you, but it's important since a great deal hinges on that as to exactly what it would take and how common this thing is, and I guess that's what my real question is, how common is minimal brain dysfunction?

"A. Well, those are the percentages I talked about. Of course, with minimal brain dysfunction, what I was leading to is the concept that at two, the chemistry of the brain and nervous system is very immature as compared to six, and at six, very immature compared to ten, and it matures up until the mid or late teenage years when it reaches maximum maturity, the chemical process of learning and thinking and problem solving. A child who has a difficulty in this area sometimes has difficulty perceiving what's going on or the information being presented to them, either through the eyes or through the ears or both, and then if you couple that with emotional strain and trauma, then this child has all the more problem sorting out who is at fault, what

the problem is, and is more easily overwhelmed or blocks more easily, and that's what I was referring to.

\* \* \* \* \* \*

"A. Again, moving into hypotheticals, in [victim's] case, it's hard for me to judge what it would look like through an average layman's eyes.

"Q. Well, let's not even make it an average layman, let's make it a drunk layman.

"A. I think that you would find a person who was not very verbale [sic], who was kind of blank in their appearance, in their face, and was kind of passive in their response.

"Q. Would you be able to recognize that as some kind of a disease or dysfunction, would a layman be able to do that?

"A. I really don't think I can make a good judgment on that. I have a hard time guessing that, whether they would or wouldn't.

"Q. Let me ask you one last question. Would all that be a guess?

"A. What?

"Q. If you testified to that, would it be a guess?

"A. If I testified to what a layman—

"Q. Yes.

"A. Yes, that would be a guess."

It is apparent that the only evidence concerning what Chavez knew or reasonably should have known is that the psychiatrist would have to guess. It follows that the jury had to guess or speculate, and that is one of the evidentiary situations upon which the trial judge should not permit the case to go to the jury. *Russell v. State*, supra.

We previously have held that sexual assault offenses require general criminal intent or a means rea. *Sanchez v. State*, Wyo., 567 P.2d 270 (1977); *Rhodes v. State*, Wyo., 462 P.2d 722 (1969). While the form of the statute has changed, we find that concept still to be apt. The legislative effort then in defining sexual assault offenses involves structuring in the statute descriptions of circumstances from which

the requisite mens rea may be inferred. Implicit in this effort is a recognition that sexual relationships may be consensual, and the criminal intent is the factor which is critical in differentiating what otherwise are very similar events. That general intent, however, must exist in the mind of the perpetrator (the "actor" under the Wyoming Statutes). It cannot be demonstrated by only the subjective mental set of the alleged victim. It is not possible to structure the criminal intent of the defendant out of the subjective attitudes of the alleged victim. In this case, for example, the seating of the victim in the automobile being to all intents and purposes voluntary conduct on her part, there would exist no intent to cause submission by forcible confinement until such time as objectively she manifested a desire to be released from the physical situation. That did not occur in this instance. Alternatively, for the mens rea to arise out of the physical helplessness of the victim, it must be found that Chavez knew or it must be found that he reasonably should have known of the physical helplessness. The record situation is such that the only inference which logically can be drawn is that *it is possible* that he should have known. We conclude that is not adequate to satisfy the burden of the State of establishing criminal intent beyond a reasonable doubt. (We note that the trial judge in this case erroneously instructed the jury with respect to specific intent. *Gallup v. State*, Wyo., 559 P.2d 1024 (1977). If that instruction is considered to be the law of this case then it was even more clear that the State with the evidence available had failed in its burden of proof.)

There undoubtedly would be instances, and even some shift of the facts in this instance might make it one of those instances, in which the mens rea of the defendant clearly would be discernible from the circumstances without regard to the subjective reflections of the victim. On the record this case is not one of those. It truly is unfortunate that this sixteen-year-old girl was involved in this situation even though, since no intercourse occurred, it did not reach the degree of a sexual assault in the classic historical sense.[1] Those same activities, however, do occur in the absence of any criminal intent. Because the evidence in this case is insufficient as a matter of law to establish the facts from which the inference of criminal intent might be drawn, we reverse Chavez's conviction and remand the case to the district court for the entry of judgment of acquittal.

ROONEY, Justice, dissenting, with whom RAPER, Chief Justice, joins.

My dissent in this matter is not based on a disagreement with the majority of the court over the law involved herein, but I do not agree with the application of the law to the facts of the case.[1]

The majority opinion properly notes the standard under which we review the sufficiency of the evidence on appeal of a criminal matter. This standard requires us to examine and accept as true the evidence of the prosecution, leaving out of consideration entirely the evidence of the defendant in conflict therewith, and give the evidence of the prosecution every favorable inference which may reasonably and fairly be drawn therefrom. *Harvey v. State*, Wyo., 596 P.2d 1386 (1979); *Tucker v. State*, Wyo., 594 P.2d 470 (1979).

As reflected in the majority opinion, there was substantial evidence that the victim was actually physically helpless. The expert psychiatric witness so testified. The question of forcible confinement and the question of whether or not Chavez knew or should have known that the victim was

---

1. Prior to the inclusion of "sexual intrusion" as a means of committing a sexual assault in the 1977 Act, evidence of penetration of the genital organs of the female by the sexual organ of the male was required to sustain a conviction. *Rhodes v. State*, Wyo., 462 P.2d 722 (1969).

1. The majority of the court found it unnecessary to address the contention of unconstitutionality of the pertinent statute inasmuch as it found error in denial of the motion for acquittal on the basis of insufficiency of the evidence. Attention to the constitutional question by me would likewise be fruitless.

physically helpless must be determined with reference to her affliction. Force is the antithesis of consent.

I find three areas in which the evidence of the prosecution, aided by reasonable inferences, is sufficient for the jury to find lack of consent and to find that Chavez should have known that the victim was not consenting to the activities and was physically helpless.

First, there was direct testimony on the point. One witness testified that she noticed the totally passive reaction of victim to trouble "when she *first* came into my Sunday school class, when I *first* approached her with a question, it was that reaction until she was comfortable with me. She could not respond to me, and she was almost—when she came out of it, out of the freeze, she would shake a little." (Emphasis supplied.) Another witness testified that the motor problem made the victim "very awkward * * * it made her very clumsy," and that under stress the victim "just closed up and kind of froze up." He gave the following answers to the following questions on cross-examination:

"Q. How would it be noticeable to other people if they had never seen Debbie before?

"A. Well, I think it would be noticeable when she became so quiet. She gets stiff, you know, like in her walk, and if she does say anything, it's a different type voice, you can tell there's fear in her voice.

"Q. Wouldn't you have to know her in order to know that?

"A. I believe that if a person was paying attention, they would know it, * * ."

The victim answered "no" to a question as to whether or not she went "along with these men willingly." She testified that he [one of the men] "directed me to the car"; that "John T. [one of the men] asked me once if I wanted to go home, and I told him yes, and he told Joe [the driver of the car] once or twice that I wanted to go home"; and that once in the car at Ranchester, there was no way in which she could have

gotten out of the car "because they were on both sides of me."

Second, the victim said only three words throughout the entire episode. When the three men approached her at the picnic table she said "I'm Debbie," and when one of the men asked her if she wanted to go home, she said "yes." The reaction of a normal person would be otherwise and defendant should have known that such reaction was not one of consent and could have been a result of physical impairment. This favorable inference could reasonably and fairly have been drawn therefrom.

Third, the determination of the condition of the victim could be premised on her appearance and actions and not only from a word description thereof given by others. Such appearance and actions could well be the basis upon which Chavez should have known of her condition. These things were presented to the jury. The victim was in court. She testified. The jury could observe her and appraise her appearance. The trial judge also had the benefit of this evidence, and he had knowledge that the jury had the benefit of it when he overruled the motion for acquittal. As said in *Madrid v. Norton*, Wyo., 596 P.2d 1108, 1117 (1979):

"* * * We must not forget that when we examine the cold words of the transcript of testimony, we do not have the benefit of how the trial judge sees and hears the witness—the pitch of the voice, facial changes, the movement in the witness—all of which may tell a separate story, to be given credence. The conclusion of what preponderates is with the trier of fact. * * *"

Here the very issue is whether Chavez should have known of the victim's physical helplessness from his observation and contact with her. More so than in connection with most issues does the jury have an opportunity to resolve the question from observation of the appearance and actions of the victim.

Applying the proper standard of review, and thus disregarding the testimony in which the witness said he would have to "guess" as to whether a layman would rec-

ognize the helplessness of victim, and thus accepting as true the testimony of the Sunday school teacher and the other witnesses referred to in the foregoing discussion, and thus giving the favorable inferences to the lack of vocal response from victim throughout the ordeal, and thus giving the same favorable inferences to the observation by the jury of victim's appearance and actions in the area in which such appearance and actions are so vital to a determination of "should have known," I find sufficient evidence upon which the jury could reach its verdict of guilty, and I would affirm insofar as this issue is concerned.