Modesto MENDICOA,
Appellant (Petitioner),

v.

The STATE of Wyoming, Appellee
(Respondent).

No. 88–260.

Supreme Court of Wyoming.

Oct. 2, 1989.

Michael D. Newman, Rock Springs, for petitioner.

Joseph B. Meyer, Atty. Gen., John W. Renneisen, Deputy Atty. Gen., and Karen A. Bryne, Sr. Asst. Atty. Gen., Cheyenne, for respondent.

Before CARDINE, C.J., and THOMAS, URBIGKIT, MACY and GOLDEN, JJ.

GOLDEN, Justice.

This appeal arises from a criminal action originally brought in Sweetwater County court. On a petition for review on certiorari from the county court, after an initial appeal to the district court, petitioner Modesto Mendicoa (Mendicoa) seeks reversals of his convictions on two counts of "importing" livestock into Wyoming without valid health certificates, in violation of W.S. 11–19–111 (1977), and the Governor's Livestock Import proclamation.

Mendicoa's issues are:

1. Did the District Court err in not ruling that W.S. 11–19–111 and the Governor's Livestock Import proclamation are unconstitutional in that the legislative branch has improperly delegated to the executive branch the authority to establish a new and distinct crime for shipping and transporting livestock through Wyoming to a destination in another state?

2. Did the District Court err in not finding that the Governor's Livestock Import proclamation was unconstitutional because it unlawfully burdened interstate commerce?

3. Did the District Court err in not finding that the trial court's instructions to the jury gave the impression that it is unlawful and a violation of W.S. 11–19–

111 to ship, transport or move any livestock into or within the State of Wyoming unless the livestock are accompanied by an official health certificate in possession of the driver?

4. Did the District Court err in affirming the trial court's denial of Defendant's Motion for Acquittal concerning the weight, sufficiency and admissibility of the evidence presented at trial, notwithstanding the jury's verdict?

We reverse Mendicoa's convictions on the grounds of insufficiency of the evidence.

In December, 1985, Kimball Call purchased 189 cattle from the Cattle Owners Association in Grantsville, Utah, with a check from Mendicoa. Shortly after the purchase, Call arranged to sell the cattle to Albert Bouziden from Oklahoma. Call obtained Utah health certificates on the cattle and loaded them onto trucks for transportation to Oklahoma. When the trucks carrying the cattle reached the Wyoming state line, they were rerouted to Manila, Utah, to be reweighed because of a dispute over the weighing process that occurred in Grantsville. Due to the time delay caused by the rerouting, the sale fell through with Bouziden and the cattle were released into Mendicoa's corrals, where they were kept separate from Mendicoa's herds.

Call renegotiated the sale with Bouziden and, on January 5, 1986, made a second attempt to ship the cattle. The trucks were again stopped at the Wyoming border, this time due to questions about the brand inspections of the cattle, and were forced to return to Manila where the cattle were again placed in Mendicoa's corrals. Due to this second delay, the deal with Bouziden again fell through.

Call renegotiated yet another deal with Bouziden and made arrangements with Ray Widmer, an independent trucker, to transport fifty-three of the Grantsville cattle to Oklahoma on January 23, 1986. After loading these cattle, Widmer went to McKinnon, Wyoming, where an additional thirty-nine cattle were loaded onto the truck, and then to Mountain View, Wyoming, where another twenty-seven cattle were loaded. While on his way to Rock Springs, Wyoming, to have health inspections performed on all the cattle, Widmer's truck was stopped by the then Deputy Sheriff of Sweetwater County, Detective Paine. When asked to produce brand and health inspections on the cattle, Widmer produced only Utah brand inspections for the fifty-three Grantsville cattle.[1] Widmer was directed to go to Rock Springs, where health inspections were conducted on all the cattle by Veterinarian Paul Zancanella. After the inspections were completed, health certificates were issued for all the cattle, and Widmer proceeded with the cattle to Oklahoma, where Bouziden received the cattle and paid Mendicoa for the cattle owned by Call and for the additional cattle picked up in McKinnon and Mountain View, Wyoming.

At the end of February, 1986, Bouziden hired Widmer to haul more cattle to Oklahoma. Widmer loaded sixty cattle in Idaho and another twenty-eight at Mendicoa's ranch in Utah. Because he did not receive health certificates on the twenty-eight Utah cattle, Widmer contacted Zancanella and arranged to have health inspections performed on them in Rock Springs. Widmer was again stopped by Paine before arriving in Rock Springs and requested to produce health certificates. Because Widmer did not have valid health certificates for the Utah cattle, Paine impounded the cattle and ordered them shipped to Rock Springs, where Zancanella performed the inspections and issued health certificates for twenty-four of the cattle; four of the

1. Utah requires only that official state brand certificates be obtained before cattle can be transported out of Utah. Utah Code Ann. §§ 4–24–15 and 17. While there is no requirement that the cattle to be exported from the State of Utah be accompanied by a health certificate, Utah statutes require written certification that any cattle imported into the State be free of tuberculosis. Utah Code Ann. § 4–31–5. Finally, while Utah owners or possessors of cattle known to be diseased are not permitted to let the diseased cattle to run at large, nor to "sell, ship, trade, or give away an infected animal without disclosing that it is diseased or has been exposed to disease," there is no specific requirement that such disclosure be in the form of an official health certificate. Utah Code Ann. § 4–31–14.

cattle were detained because of questionable ownership. The twenty-four Utah cattle and sixty Idaho cattle were then transported to Bouziden in Oklahoma.

On March 18, 1986, Mendicoa was criminally charged with two counts of importing livestock into Wyoming without valid health certificates, in violation of W.S. 11–19–111, resulting from the January 23, and March 5, 1986, shipments of cattle by Widmer. A jury trial was held on March 24, and 25, 1987. At the close of the state's case, Mendicoa argued that the state had failed to produce sufficient evidence to support a conviction of the counts against him and moved to dismiss. The trial court treated the motion as a motion for acquittal and denied it. The jury found Mendicoa guilty. On April 3, 1987, Mendicoa moved for acquittal and for a new trial, which motions were denied by the county court on April 16, 1987. Mendicoa appealed his convictions to the district court, which affirmed his convictions on September 14, 1988. Mendicoa then filed a Petition for Review on Certiorari with this court, which we granted.

## I. CONSTITUTIONALITY OF PROCLAMATION

W.S. 11–19–111 authorizes the Governor to regulate by proclamation the importation into Wyoming of livestock or anything suspected of being infected with livestock disease germs. The pertinent portions of the statute read:

(a) The governor, upon recommendation of the Wyoming livestock board, may regulate by proclamation the importation into Wyoming from any other state any livestock, or any virulent blood or live virus of any disease affecting livestock, or anything suspected of being infected with livestock disease germs, except under such conditions as he deems proper for the protection of the livestock of Wyoming. All requirements in the governor's proclamation shall be enforced by the Wyoming livestock board.

(b) After a proclamation is issued by the governor it is unlawful for any person to import into Wyoming or receive imports within this state from any other state any livestock, virulent blood or live virus or diseases affecting livestock, or any product or thing suspected of being infected with livestock disease germs, except under such conditions as may be imposed by the proclamation. Any person who violates this section shall be punished as provided in W.S. 11–1–103. The violator is civilly liable for all damages and loss sustained by any person by reason of violation of the proclamation.

Pursuant to the statute the Governor issued a proclamation in 1984, which reads in pertinent part:

(2)(d) All livestock shipped or in any manner transported or otherwise moved or received into Wyoming * * * shall be accompanied by an official health certificate which shall be in the possession of the driver of the vehicle or person in charge of the livestock. Such livestock shall not be diverted from destination for any purpose.

\* \* \* \* \* \*

(iv) Health certificates shall be valid for ten days following date of inspection and issuance. All health certificates shall be issued to comply in all respects with requirements of the State of Wyoming unless specifically authorized in writing by the Wyoming State Veterinarian.

In his first issue Mendicoa contends that the proclamation expands on the activities intended by the legislature to be regulated under W.S. 11–19–111, by including within its scope shipping and transporting of livestock *through* Wyoming to a destination in another state, as opposed to the mere importation *into* Wyoming. He argues that the statute constitutes an improper delegation of legislative authority to the executive branch, which enabled the Governor to exceed his authority by establishing a new and distinct crime for shipping and transporting livestock through the state. We disagree.

When interpreting a statute or provision we search for legislative intent. *Department of Revenue and Taxation of the State of Wyoming v. Hamilton*, 743 P.2d 877, 879 (Wyo.1987). We always

begin that search by focusing on the language of the legislative enactment, giving that language plain and ordinary meaning unless otherwise indicated. *Schultz v. State,* 751 P.2d 367, 370 (Wyo. 1988); *Hamilton,* 743 P.2d at 879; *Mahoney v. L.L. Sheep Company,* 79 Wyo. 293, 333 P.2d 712, 715 (1958). *Department of Revenue and Taxation v. Casper Legion Baseball Club,* 767 P.2d 608, 610 (Wyo.1989). W.S. 8–1–103(a)(i) (1977) provides: "Words and phrases shall be taken in their ordinary and usual sense, but technical words and phrases having a peculiar and appropriate meaning in law shall be understood according to their technical import."

The words and phrases used in the statute and the proclamation are not technical, and their meanings are easy to understand. W.S. 11–19–111 uses the word "importation" to denote the activity to be regulated. *Black's Law Dictionary* defines "importation" as the "act of bringing goods and merchandise into a country from a foreign country." *Black's Law Dictionary* 680 (5th ed. 1979) (citing *Cunard Steamship Co. v. Mellon,* 262 U.S. 100, 43 S.Ct. 504, 67 L.Ed. 894 (1923)). Similarly, *Webster's Third New International Dictionary* 1135 (1966) defines "importation" as "the act or practice of bringing in (as merchandise) from an outside or foreign source."

On the other hand, the Governor's proclamation uses the phrase "shipped or in any manner transported or otherwise moved or received into." The word "ship" is defined as "to transport; * * * [t]o send by established mode of transportation, as to 'carry,' 'convey,' or 'transport,' which are synonymous and defined, respectively, as 'to bear or cause to be borne as from one place to another,' and 'to carry or convey from one place to another.'" *Black's* at 1235 (citing *Chicago, R.I. & P. Ry. Co. v. Petroleum Refining Co.,* D.C.Ky, 39 F.2d 629, 630 (1930)). To "transport," one must "carry or convey from one place to another." *Black's* at 1344 (citing *Sacramento Nav. Co. v. Salz,* 273 U.S. 326, 47 S.Ct. 368, 71 L.Ed. 663 (1927); *People v. One 1941 Cadillac Club Coupe,* 63 Cal.App.2d 418, 147 P.2d 49, 51 (1944)). "Move" is defined as "to leave one point or place and go on to a new one." *Webster's* at 1479. Finally, "receive" means "to take into possession and control" or "take possession or delivery of; to take in." *Black's* at 1140; *Webster's* at 1894.

Standing alone the words "shipped," "transported," "moved" and "received" could denote movement through a state, as Mendicoa argues. However, with the addition of the word "into," which modifies each of the words used in the phrase, the words take on specific meanings entirely consistent with the definition of "importation": the act of being brought into the State of Wyoming. In defining the word "into," the United States Supreme Court stated:

> [T]here is no ground for the holding that the prohibition of the statute against transporting liquor in interstate commerce "into any State or Territory the laws of which prohibit the manufacture," includes the movement in interstate commerce through such a State to another. * * * [T]he context makes clear that the word "into" as used in the statute, refers to the State of destination, and not to the means by which that end is reached, the movement through one State as a mere incident of transportation to the State into which it is shipped.

*United States v. Gudger,* 249 U.S. 373, 374–75, 39 S.Ct. 323, 63 L.Ed. 653 (1919). Consistent with *Gudger,* the Federal District Court for the District of Montana stated:

> To be "imported," it must be of foreign situs, and brought hither by the owner, or with his consent, with the intent to be here held, used, consumed, or enjoyed, or to be here incorporated in the general mass of property. If brought hither by accident, great, if not inevitable, necessity, superior force, or by a trespasser, and timely removed hence, it is not "imported" nor dutiable, nor subject to forfeiture against the owner.

*United States v. Eighty–Five Head of Cattle,* 205 F. 679, 681 (D.Mont.1913).

The phrase used in the proclamation, "shipped or in any manner transported or otherwise moved or received into," has the same meaning as the word "importation" used in the statute. As such, the proclamation tracks the statute and regulates only that which was intended by the legislature to be regulated, the *importation* into Wyoming of livestock. It does not enlarge on the activities to be regulated by including *transportation through* the state. Because the proclamation only regulates the importation of livestock into Wyoming, the Governor did not exceed his authority in its promulgation; he did not establish a new and distinct crime for the *transportation* of livestock *through* Wyoming.

Whether it was proper for the legislature to delegate the authority to the Governor to promulgate the proclamation turns on the distinction between the delegation of the power to *make* law and delegation of the power to *execute* a law properly made. This distinction has been recognized in Wyoming cases involving livestock. *Arbuckle v. Pflaeging,* 20 Wyo. 351, 373–74, 123 P. 918, 924 (1912); *Richter v. State,* 16 Wyo. 437, 443, 95 P. 51, 52 (1908).

This true distinction, upheld by the United States Supreme Court, "is between the delegation of power *to make the law,* which necessarily involves a discretion as to what it shall be, and conferring an authority or discretion as to its *execution,* to be exercised under and in pursuance of the law." (emphasis added.) *J.W. Hampton, & Co. v. United States,* 276 U.S. 394, 407; 48 S.Ct. 348, 351, 72 L.Ed. 624, 629–30 (1928); *St. Louis Merchants' Bridge T. Ry. Co. v. United States,* 188 F. 191, 195 (8th Cir.1911) (quoting *Marshall Field & Co. v. Clark,* 143 U.S. 649, 693, 12 S.Ct. 495, 36 L.Ed. 294 (1892)); *State v. McCarty,* 5 Ala. App. 212, 59 So. 543, 546 (1912); *C.W. & Z. Rail Road Co. v. Commissioners of Clinton County,* 1 Ohio 77, 88–89 (1852). The first cannot be done, but there is no valid objection to the latter. *J.W. Hampton,* 276 U.S. at 407, 48 S.Ct. at 351, 72 L.Ed. at 629–30; *C.W. & Z,* 1 Ohio at 88–89; *McCarty,* 59 So. at 546. See *State ex rel. Stocker v. City of Laramie,* 737 P.2d 746, 750 (1987); *Eastwood v. Wyoming High-way Department,* 76 Wyo. 247, 301 P.2d 818, 823 (Wyo.1956). So long as the legislature "'shall lay down by legislative act an intelligible principle to which the person or body authorized to (exercise the delegated authority) is directed to conform, such legislative action is not a forbidden delegation of legislative power.'" *Mistretta v. United States,* —— U.S. ——, ——, 109 S.Ct. 647, 654, 102 L.Ed.2d 714, 730–31 (1989) (quoting *J.W. Hampton,* 276 U.S. at 409, 48 S.Ct. at 352, 72 L.Ed. at 630). The power to delegate authority to the executive branch to execute the various statutes is a recognition of the great disadvantage to the legislature "in solving many of the complex and difficult problems with which it is confronted," if it were prohibited from delegating such ministerial authority. *State v. Kellogg,* 98 Idaho 541, 568 P.2d 514 (1977) (quoting *Boise Redevelopment Agency v. Yick Kong Corp.,* 94 Idaho 876, 499 P.2d 575 (1972)).

Here, the proclamation tracks W.S. 11–19–111. It does not regulate activities the legislature did not intend to regulate, but provides regulatory procedures that conform with the purpose of the statute. Moreover, the proclamation does not create a new and distinct crime. As such, the legislature did not improperly delegate its authority to the executive branch and the proclamation is not unconstitutional.

## II. INTERSTATE COMMERCE

Mendicoa's next argument that the proclamation burdens interstate commerce is premised on his contention that the proclamation goes beyond the scope of the statute by regulating the transportation of cattle through the state rather than simply regulating their importation into the state. Because the proclamation does not go beyond the scope of activities regulated by the statute, Medicoa's premise does not exist; the proclamation regulates only the importation of cattle into Wyoming and, therefore, does not burden interstate commerce. The power of a state to regulate products imported into its boundaries, as opposed to products being transported through the state, has long been recog-

nized in cases involving interstate commerce. As stated in *Grimes v. Eddy*, 126 Mo. 168, 28 S.W. 756, 26 L.R.A. 638, 645 (1894):

> The power to prevent the *importation* of diseased or infected cattle into the state, and the power to prevent the *transportation* of such cattle through the state over the great thoroughfares,—railroads,—or by river, rests upon very different principles. The one [importation into the state] * * * may be regulated or prohibited by the state, in the exercise of its police power; while the other [transportation through the state] is a plain regulation of interstate commerce, a regulation extending to prohibition. (emphasis added).

Here, only the importation of cattle into Wyoming is being regulated by the proclamation; within the general police power, this is permitted.

## III. INSTRUCTIONS

Mendicoa next argues that jury instructions nos. 6, 8, 9 and 10 were improper because they created the impression that it is unlawful and a violation of W.S. 11–19–111 to ship, transport or move any livestock into or within the State of Wyoming unless accompanied by a valid health certificate. We disagree. A close reading of the challenged instructions reveals that they in essence mirror the language of the proclamation and W.S. 11–19–111. Our holding that the proclamation does not go beyond the scope of activities intended to be regulated in W.S. 11–19–111 makes further discussion of this assignment of error unnecessary.

## IV. SUFFICIENCY OF EVIDENCE

■ The final question to be addressed is whether sufficient evidence was presented to convict Mendicoa of "ship[ping] or in any manner transport[ing], or otherwise mov[ing], or receiv[ing]" cattle into the State of Wyoming without valid health certificates. We hold that sufficient evidence was not presented, and reverse.

The standard for reviewing the sufficiency of the evidence in criminal cases is

not whether the evidence establishes guilt beyond a reasonable doubt for us, but rather whether it is sufficient to form the basis for a reasonable inference of guilt beyond a reasonable doubt to be drawn by the [trier of fact] when the evidence is viewed in the light most favorable to the State.

> * 、 * * * * *

It is not our function to weigh the evidence for a determination as to whether or not it is sufficient to establish guilt beyond a reasonable doubt. We have consistently held that even though it is possible to draw other inferences from the evidence presented, it is the responsibility of the [trier of fact] to resolve the conflicts in the evidence.

*Righter v. State*, 752 P.2d 416, 420 (Wyo. 1988) (quoting *Broom v. State*, 695 P.2d 640, 642 (Wyo.1985)).

Pursuant to the instructions, the state had to prove beyond a reasonable doubt that Mendicoa imported (consistent with the plain meaning of that word) cattle into Wyoming without valid health certificates. Before determining whether the state met its burden, we first recognize a concern as stated by the Eighth Circuit Court of Appeals in 1911:

> A penal statute which creates and denounces a new offense, and the act under consideration is such a statute, should be strictly construed. A man ought not to be punished unless he falls plainly within the class of persons specified as punishable by such a law. The definition of offenses and the classification of offenders are legislative and not judicial functions, and where, as in the case at bar, a penal statute is plain and unambiguous, the courts may not lawfully extend it to a class of persons who are excluded from its effects by its terms * * *.

In *United States v. Wiltberger*, 5 Wheat. 76, 5 L.Ed. 37 (1820), Chief Justice Marshall said:

> "The case must be a strong one, indeed, which would justify a court in departing from the plain meaning of words, especially in a penal act, in

search of an intention which the words themselves did not suggest. To determine that a case is within the intention of a statute, its language must authorize us to say so. It would be dangerous, indeed, to carry the principle that a case, which is within the reason or mischief of a statute, is within its provisions, so far as to punish a crime not enumerated in the statute, because it is of equal atrocity, or of kindred character, with those which are enumerated." *St. Louis Merchants' Bridge T. Ry. Co.*, 188 F. at 193–94. We are guided by the principle that the court may not construe a statute in such a manner as will enlarge, stretch, expand or extend it to matters not falling within its express provisions. *Department of Revenue and Taxation, Motor Vehicle Division v. Andrews*, 671 P.2d 1239, 1246 (Wyo.1983); *Matter of TRG*, 665 P.2d 491, 498 (Wyo.1983). It is our duty to ascertain the intention of the legislature as completely as possible from the language used in the statute itself. Having done so above we can only conclude that the trial court permitted the prosecution of a person, Mendicoa, who was clearly not covered by the language of the statute and attendant proclamation, which is clear and unambiguous. This action was error.

The evidence presented at trial by the state established that Mendicoa's actions constituted only *transportation* of cattle *through* the State of Wyoming, not the *importation* of cattle *into* the state. At the close of the state's case, Mendicoa moved for acquittal on the basis of insufficiency of the evidence. A motion to acquit must be granted when the evidence is such that a reasonable juror must have a reasonable doubt as to the existence of any of the essential elements of the crime. Further, if the evidence is such as to permit the jury to merely conjecture or speculate as to the Defendant's guilt, the trial judge should not allow the case to go to the jury. *Chavez v. State*, 601 P.2d 166, 170 (Wyo. 1979). Under this standard, Mendicoa's motion should have been granted. This record is completely devoid of any evidence showing or tending to show that the cattle were ever intended by Mendicoa to be held, used, consumed or enjoyed in Wyoming or incorporated into its general mass of property. *Eighty–Five Head of Cattle*, 205 F. at 681. The uncontroverted testimony of every witness showed that the cattle were intended to be transported *through* the State of Wyoming to Albert Bouziden in Kansas or Oklahoma, and were in fact transported to him.

To uphold the conviction of Mendicoa in light of this evidence would be to permit the conviction of a person innocent of the crime charged. Mendicoa was charged with and convicted of importing cattle into the state, when all the evidence proves that he did not import the cattle into Wyoming, as the word "import" is plainly understood, but rather transported them through the state. By denying Mendicoa's motion for acquittal, the trial court enlarged, stretched, expanded or extended the statute to matters not falling within its express provisions to include the transportation of cattle through the state. *Andrews*, 671 P.2d at 1246; *Matter of TRG*, 665 P.2d at 498. We cannot permit this conviction to stand because in doing so we would be condoning the regulation of interstate commerce, which is not allowed. *Grimes*, 126 Mo. at 188, 28 S.W. 756, 26 L.R.A. at 645.

Mendicoa's conviction is reversed as his actions did not fall within the confines of the statute and proclamation under which he was charged and convicted.

CARDINE, C.J., files a dissenting opinion with whom THOMAS, J., joins.

THOMAS, J., files a dissenting opinion, with whom CARDINE, C.J., joins.

THOMAS, Justice, dissenting, with whom CARDINE, C.J., joins.

Like Chief Justice Cardine, I am persuaded that this case is erroneously decided. Consequently, I join in his dissenting opinion and add these comments.

It is important to remember that this is the Supreme Court of the State of Wyoming. While our oath of office calls us to

support and defend the Constitution of the United States of America, our primary obligation still is service to the citizens of this state. Their interests deserve priority in this court so long as it is possible to serve them without contravening the Constitution of the United States of America.

In this instance, I detect a sense by the majority that somehow it is compelled to refuse to include cattle that are intended to simply pass through the state of Wyoming within the phrase "import into" because of the Commerce Clause of the Constitution of the United States of America. I do not believe that compulsion is present and, consequently, I would include the cattle that are involved in these facts within the reach of the legislation and the executive order. It is important to remember that, even though the cattle are intended to simply travel through the state of Wyoming, fortuitous events may cause them to come to rest here. A breakdown or wreck of a truck or a train, bad weather, or, perhaps, even the seizure of the cattle as evidence are all examples of fortuitous events that could cause diseased cattle to come to rest within this state. Perceived in that light, I am satisfied that the requirement for a health certificate for such animals is not such a burden on interstate commerce that it cannot be justified as a reasonable exercise of the police power of the state.

In *Duckworth v. State of Arkansas*, 201 Ark. 1123, 148 S.W.2d 656 (1941), the court held, in essence, that "into" includes "through." The case was reviewed by the Supreme Court of the United States, and that concept was affirmed. The court addressed the commerce clause from the perspective that exercise of the police power may be invoked to regulate matters of local concern. *Duckworth v. State of Arkansas*, 314 U.S. 390, 62 S.Ct. 311, 86 L.Ed. 294, 138 A.L.R. 1144 (1941). It would not seem to make any difference that the subject matter of the transportation is cattle and the local concern is health matters relating to livestock, rather than liquor. *Johnson v. Yellow Cab Transit Company*, 137 F.2d 274 (10th Cir.1943), *aff'd.*, 321 U.S. 383, 64 S.Ct. 622, 88 L.Ed. 814 (1944), is authority for the requirement of a permit for the transportation of liquor in interstate commerce through the state. The state of Oklahoma was upheld in the exercise of a reasonable restriction on transportation through the state that was found not to be an impermissible burden on interstate commerce.

The events in this case are not significantly different from those in the cases cited, and I would hold that the phrase "import into" includes livestock that are intended to simply pass through the state of Wyoming to another destination. Viewed from that perspective, I would find the evidence in this case to be sufficient to affirm the conviction of Mendicoa.

CARDINE, Chief Justice, dissenting, with whom THOMAS, J., joins.

This case turns on the interpretation of the phrase "import into" in the enabling legislation. The central dispute is whether "import into" includes cattle intended to be delivered outside Wyoming but transported through the state. I believe the opinion reaches a bad result as a matter of law and policy for it holds that the State of Wyoming must allow the transportation of diseased cattle "into" the State of Wyoming if they are only passing through.

The opinion, citing *United States v. Gudger*, 249 U.S. 373, 39 S.Ct. 323, 63 L.Ed. 653 (1919)—a case involving transportation of healthy liquor—and *United States v. Eighty-five Head of Cattle*, 205 F. 679 (D.Mont.1913), holds that all words and phrases involved in the statute and executive order are used in their ordinary and usual sense, i.e., their "plain meaning." I do not believe the phrase "import into" is accorded its "plain meaning" by the court. The dictionary plain meaning of the word "into" is "indicating place entered," Webster's New International Dictionary (2nd ed. 1957), "denoting * * * entrance in respect of a place," Funk & Wagnalls New Standard Dictionary (1944), and "used to indicate entry," Random House Dictionary (1966). "Import" is generally defined as "to bring in from a foreign or external source." Webster's, supra. If these plain meanings are accepted, Mendicoa violated

Wyoming law when the cattle were "transported into" Wyoming, and it was not relevant that they were then "transported through" Wyoming. In other words, it is more consistent with the common usage of the phrase "import into Wyoming" to say it means to bring something across the state line into Wyoming. Not surprisingly, this was apparently the interpretation given by the trial court where Mendicoa was convicted.

I would affirm because I believe the legislature intended and the governor's proclamation provides that only healthy cattle be brought into the State of Wyoming. I have no problem requiring a health certificate for a product entering Wyoming which may bring with it infectious disease. I cannot help wondering about the states that inspect for diseased plants and fruit at their border. If the fruit is passing through rather than coming to rest, are the states powerless to take this action?